## S07F0358. TAYLOR v. TAYLOR.
### (646 SE2d 238)

BENHAM, Justice.

After appellant Mark Q. Taylor (Husband) and appellee Melinda C. Taylor (Wife) married in 2001, Husband adopted Wife's minor child who was born in 1996. Wife filed for divorce in April 2005 and the parties filed a settlement agreement resolving all issues other than disposition of the marital home, as to which Husband filed a demand for jury trial. After an interlocutory hearing, the trial court required Husband's visitation with the child be supervised pending the divorce. Wife amended her petition to seek attorney fees, to seek approval of the settlement agreement as to property, and to seek termination of Husband's parental rights. When the case came on for trial, Husband withdrew his jury demand and the case was tried before the trial court. In the final decree, the trial court awarded the marital home to Wife, divided other property, awarded sole custody of the child to Wife and denied Husband any visitation, and awarded attorney fees to Wife, but no child support. Husband's timely-filed application for discretionary review of the final judgment and decree of divorce was granted in accordance with this Court's Family Law Pilot Project, pursuant to which this Court grants all non-frivolous applications seeking discretionary review of a final judgment and decree of divorce. *Maddox v. Maddox*, 278 Ga. 606, n. 1 (604 SE2d 784) (2004).

1. The trial court denied Husband any visitation with the child, a ruling he contends is not supported by the evidence.[1]

> The express policy of this state is to allow visitation rights to divorced parents who have demonstrated the ability to act in their minor children's best interests. [Cit.] Therefore, only in exceptional circumstances should the non-custodial parent be denied the right of access to his child. [Cit.]

*Woodruff v. Woodruff*, 272 Ga. 485 (1) (531 SE2d 714) (2000). In the present case, the trial court made extensive findings regarding conduct of Husband relating to his fitness as a parent: chronic use of illegal drugs by Husband, sometimes in the presence of children, and by members of his family, including a niece who babysat for the child;

---

[1] In two enumerations of error, Husband complains of the trial court's termination of his parental rights, contending it was done because he is an adoptive father rather than a biological father and that the evidence did not meet the standards for termination of parental rights. The record shows, however, the trial court did not terminate Husband's parental rights and made no reference to a distinction between adoptive and biological parents, but denied Husband any visitation with the child.

a complete lack of parenting skills and a lack of motivation to improve in that regard; an absence of judgment, exemplified by having the child spend the night with him in an apartment he shared with an unmarried man who brought home intoxicated women who spent the night; abuse of religion to defame Wife and frighten the child, in direct violation of a court order to refrain from doing so; erratic behavior, rage, and violence which led Wife's older two children to live with their father to avoid Husband; and the recommendations of the child's therapist and the guardian ad litem that the child have no contact with Husband.

> Where parents contest the issue of custody of a child, [which includes visitation (*Ledford v. Bowers*, 248 Ga. 804 (1) (286 SE2d 293) (1982)),] the trial court has very broad discretion, looking always to the best interest of the child. [Cit.] When the trial court has exercised that discretion, this court will not interfere unless the evidence shows a clear abuse of discretion, and where there is any evidence to support the trial court's finding, this court will not find there was an abuse of discretion. [Cit.]

*Frazier v. Frazier*, 280 Ga. 687, 689 (2) (631 SE2d 666) (2006). Since the trial court's findings regarding Husband's fitness as a parent are supported by some evidence and amount to the "exceptional circumstances" to which this Court made reference in *Woodruff*, supra, we conclude the denial of visitation to Husband was not an abuse of discretion.

2. Husband contends the trial court's judgment must be reversed because a holding in the decree that Husband had contemptuously refused to obey prior orders of the court was not supported by evidence showing disobedience by him of a single order he was capable of obeying. If there is any evidence to support a trial court's findings, they must be sustained. *Namik v. Wachovia Bank of Ga.*, 279 Ga. 250 (2) (612 SE2d 270) (2005). The parties to the present case were ordered to abstain from disparaging remarks about the other and from providing their own interpretation of scripture because Husband, while exercising visitation with the child, had used his interpretations of the Bible to disparage Wife and her decision to divorce him. Notwithstanding that order, the testimony at trial established that Husband continued to express the same negative judgments of Wife and purported to justify his opinions by his interpretation of the Bible. It appears, therefore, the trial court's finding of Husband's disobedience was supported by some evidence and cannot, therefore, be deemed erroneous. Id.

3. Finally, Husband complains of the trial court's award of attorney fees to Wife, contending there was insufficient evidence to support the award. The trial court found Husband had conducted himself during the litigation in a manner intended to prevent completion of the case, to harass and annoy Wife, and to cause her attorney fees to increase, citing as examples Husband's conduct regarding removal of his property from the marital home, his filing of a jury demand and subsequent withdrawal of that demand on the date of the hearing, and his agreement during a hearing regarding division of the equity in the marital home to buy the home, followed by his subsequent failure to keep that agreement. Under OCGA § 9-15-14 (b), a trial court can award attorney fees against a party who has unnecessarily expanded the litigation or acted to cause delay or harassment. The evidence of Husband's conduct during the litigation met that standard. Wife's counsel's statement in her place of the amount of fees incurred by Wife and the reasonableness of those fees was sufficient to support the trial court's award (*Hibbard v. McMillan*, 284 Ga. App. 753, 757 (3) (645 SE2d 356) (2007); *Campbell v. Beak*, 256 Ga. App. 493 (5) (568 SE2d 801) (2002)) and Husband's failure to question Wife's counsel or seek more information waived his complaint regarding those issues. *Hadlock v. Anderson*, 246 Ga. App. 291 (2) (540 SE2d 282) (2000). Since the award was sustainable under OCGA § 9-15-14 (b), we need not consider whether it was sustainable under the other statutory provisions cited by the trial court.

*Judgment affirmed. All the Justices concur, except Sears, C. J., and Hunstein, P. J., who dissent.*


SEARS, Chief Justice, dissenting.

Make no mistake about it: Mark Q. Taylor will never see his ten-year-old daughter Sidney again. And the reason is because he legally adopted her instead of contributing his genetic material to her conception. Mr. Taylor is the only father Sidney has ever known. He has never abused Sidney, neglected her, or abandoned her as her biological father, her mother's second husband, did before she was even born. The mother testified at trial that Mr. Taylor loves Sidney, and that Sidney loves Mr. Taylor and still calls him "daddy." Between the parties' separation and the trial well over a year later, Mr. Taylor stopped smoking marijuana completely, voluntarily paid child support for Sidney every month, and stayed in intensive counseling, some of which was court-ordered, but most of which he voluntarily undertook. Moreover, by the time of trial, Mr. Taylor had participated in nine months of highly successful supervised visitation with Sidney, paying thousands of dollars in the process simply for the opportunity to see his young daughter for a few hours each month.

The majority opinion contorts the record, misconstrues both the purpose and effect of the final judgment, and ignores the trial court's deliberate subterfuge in issuing a de facto termination order under the guise of an order denying all visitation — the precise course the guardian ad litem urged the trial court to take to avoid an insurmountable jurisdictional obstacle, as well as the clear and convincing evidence standard of proof that is constitutionally mandated in termination of parental rights proceedings. The record lacks even "some evidence" of the exceptional circumstances required before a court can deny a parent all in-person visitation with his or her own child on a temporary basis. The evidence is nowhere close to being clear and convincing that Mr. Taylor is an unfit parent and that it would be in Sidney's best interests to terminate her relationship with him. An adoptive parent, no less than a biological parent, deserves better than this. Accordingly, I respectfully dissent.

I. *The Majority Opinion Misstates the Record.*

The caricature painted by the majority — that of a violent drug fiend who makes his young daughter stay with him in ramshackle accommodations frequented by shadowy characters — bears no resemblance whatsoever to the actual father involved in this case. The majority opinion approves the trial court's finding of "chronic use of illegal drugs by [Mr. Taylor], sometimes in the presence of children." What the majority fails to mention is that there is not one shred of evidence in the record — not one — that Mr. Taylor used any illegal drug for well over a year before the trial.

Moreover, it is worth noting that there is no allegation, much less evidence, that Mr. Taylor ever used "illegal drugs," plural, as the majority opinion erroneously states. Mr. Taylor was addicted to a single illegal drug, marijuana, and by the time of trial, it is undisputed that he had not smoked marijuana in almost 16 months.[2] Similarly, there is no allegation, much less evidence, that Mr. Taylor ever smoked marijuana in front of Sidney. Indeed, the record is devoid of any evidence that Mr. Taylor "sometimes [smoked marijuana] in the presence of children," plural, as the majority opinion incorrectly states. The sum total of the evidence in the record that Mr. Taylor smoked marijuana "sometimes in the presence of children" consists of the trial testimony of Ms. Taylor's middle child that she once caught

---

[2] It is also worth noting that Ms. Taylor has herself smoked marijuana in the past, although there is no allegation or evidence that Ms. Taylor ever smoked marijuana on a regular basis. Ms. Taylor also drinks alcohol and smokes three-quarters of a pack of cigarettes a day, while Mr. Taylor is neither a drinker nor a smoker. The evidence also shows that Ms. Taylor smokes around Sidney, even when they are in the car, in spite of the fact that Sidney suffers from allergies.

Mr. Taylor in the basement blowing smoke out of his mouth, which she assumed was from marijuana.[3]

The majority opinion approves the trial court's finding of "chronic use of illegal drugs" not only by Mr. Taylor, but also "by members of his family, including a niece who babysat for the child." Again, there is only one illegal drug at issue, marijuana, not "illegal drugs" as the majority erroneously states. Moreover, the finding of "chronic use of illegal drugs by . . . a niece who babysat for the child" rests entirely on the following snippet of testimony by Mr. Taylor's 21-year-old niece on cross-examination:

Q. . . . Have you smoked pot?
A. I have.
Q. Have you smoked pot around Sidney?
A. Never.
. . .
Q. How long have you been smoking pot?
A. Oh, I don't smoke pot. I've tried it, once or twice.

The majority opinion also asserts that the record reveals "a complete lack of parenting skills [on Mr. Taylor's part] and a lack of motivation to improve in that regard." Not true. Rather, the record shows that in the three-and-a-half years Mr. Taylor lived at the marital residence, he took Sidney to school in the mornings, looked after her when Ms. Taylor was away on business trips, read to Sidney, took her to dental appointments, and tucked her into bed every night. He taught Sidney how to say "I love you" in sign language, the language of his own parents, both of whom were deaf. After the separation, he could no longer tuck Sidney in bed every night, but he took advantage of every opportunity he had to visit with her, even when it meant paying for supervised visitation. He brought her gifts, remembered her birthday, and called her regularly on the phone. Like most parents, and very unfortunately, Mr. Taylor lost his temper at times and occasionally said things to Sidney while he was living at the marital residence that he later regretted. After the separation, Mr. Taylor *voluntarily* entered counseling to learn how to be a better parent, to help him cope with the divorce and separation from his child, and to find better ways of managing his emotions than keeping his anger all bottled up inside until it boiled over.[4]

---

[3] Mr. Taylor denies this incident ever occurred.

[4] In the three-and-a-half years Mr. Taylor lived with Sidney under the same roof, it is undisputed that he spanked her only twice, a form of discipline Ms. Taylor herself uses.

The majority opinion claims the record shows that Mr. Taylor displayed "an absence of judgment, exemplified by having the child spend the night with him in an apartment he shared with an unmarried man who brought home intoxicated women who spent the night." What the record actually shows is that when Ms. Taylor asked Mr. Taylor to leave the marital home in March of 2005, he did so with nothing more than the clothes on his back and a little cash in his wallet. A friend with a one-bedroom apartment allowed Mr. Taylor to stay on his couch until he could get back on his feet. Ms. Taylor refused to let Mr. Taylor exercise visitation with Sidney at the marital home. Thus, if Mr. Taylor was going to have visitation with his daughter, he had little choice but to have her stay with him where he was living. Sidney stayed with Mr. Taylor at his shared one-bedroom apartment on only two occasions. On one of the two visits, Mr. Taylor's roommate allowed a friend who had had too much to drink at the bar that night to stay at the apartment rather than driving home drunk. How did Mr. Taylor respond? The record shows he arranged to have all further overnight visitation with Sidney take place at his sister's house, which no one contends was in any way an inappropriate environment for the child. Moreover, there is no evidence that anything improper occurred in the child's presence on the two occasions Sidney stayed with Mr. Taylor at his apartment. By the time of trial, Mr. Taylor was living in a house where Sidney would have her own room in the event she was ever allowed to visit him again. Far from showing "an absence of judgment" as the majority opinion contends, the record instead reveals a conscientious father with little money who was doing the best he could to provide a safe and appropriate environment for visitation with his child.

The majority opinion further states that Mr. Taylor "abuse[d] . . . religion to defame [Ms. Taylor] and frighten the child, in direct violation of a court order to refrain from doing so." However, that is not what the relevant court order said. The order the majority opinion appears to be referring to is the temporary consent order entered by the trial court on April 18, 2006. In it, the trial court issued the following injunction:

> Each party is hereby enjoined and restrained from villifying and/or making any disparaging statements about the other *to the minor child* and each party is prohibited from providing their [sic] interpretation of any religious scripture to the minor.

(Emphasis supplied.) I have searched the record in vain to find any evidence that Mr. Taylor violated this injunction. By April 18, 2006,

his visits with Sidney were all closely supervised, and the contemporaneous reports prepared by the agency supervising the visits gives no indication that Mr. Taylor said anything to Sidney that could be construed as falling within the scope of the trial court's injunction.[5]

The majority opinion's reference to "erratic behavior, rage, and violence which led [Ms. Taylor's] older two children to live with their father to avoid" Mr. Taylor relates primarily to Mr. Taylor's alleged yelling at the older children, occasional throwing of objects not directed at any person, the two occasions during the parties' marriage when Mr. Taylor spanked Sidney, and one incident, which Ms. Taylor only remembered shortly before the trial, in which Mr. Taylor allegedly slapped Sidney across the face at a cheerleading competition before the parties separated in March 2005. As the guardian ad litem accurately stated at trial:

> There's no indication that Mr. Taylor ever was what we might call a child abuser. . . . I don't think . . . anybody would point to Mr. Taylor and say this guy is a chronic child abuser. That's not the situation.

The record indicates that Mr. Taylor had a short fuse, but his response to losing his temper was generally to brood and say nothing rather than to lash out verbally at those around him. While Mr. Taylor's actions may demonstrate that he is not a perfect person, they fall far short of the "exceptional circumstances" necessary to deny a parent all in-person visitation with his or her own child, much less constitute the clear and convincing evidence of parental unfitness required to terminate Mr. Taylor's parental rights.

Finally, the majority opinion notes "the recommendations of the child's therapist and the guardian ad litem that the child have no contact" with Mr. Taylor. As explained in greater detail below, these recommendations were unreliable as a matter of both law and fact. In terms of the law, Lorita Whitaker, the person the majority describes

---

[5] Before the institution of supervised visitation nine months prior to trial, Mr. Taylor had made some statements to the child invoking religion that were clearly inappropriate. There is also some evidence in the record that Mr. Taylor left messages for his soon-to-be ex-wife invoking religion alternately to exhort her not to break up their marriage and condemning her if she did. The record suggests that Mr. Taylor continued to leave voicemail messages for Ms. Taylor along these same lines even after the entry of the temporary consent order on April 18, 2006. However, at that point, Ms. Taylor had complete control over whether Sidney was exposed to the things Mr. Taylor said in his messages. Moreover, it would be inappropriate to punish Mr. Taylor, and Sidney, by terminating all interaction and communication between them as a way of coercing Mr. Taylor into complying with the order as it related to voicemails he was leaving for Ms. Taylor.

as "the child's therapist,"[6] stated clearly at trial that her recommendation to the trial court would be different if Mr. Taylor were Sidney's biological father instead of her adoptive father. In terms of the facts, Ms. Whitaker's contemporaneous, handwritten notes from her individual sessions with Sidney and the initial visitation sessions she supervised between Sidney and Mr. Taylor vividly and dramatically contradicted her trial testimony. Moreover, Ms. Whitaker never recommended that the trial court terminate Mr. Taylor's parental rights until *after* the guardian ad litem made a recommendation to that effect. The record contains no explanation for Ms. Whitaker's change of heart months after her last supervised visitation session with Mr. Taylor and Sidney.[7]

The guardian ad litem's recommendation was equally unreliable. As explained in greater detail below, the guardian ad litem's statements at trial reflect the bizarre and legally untenable notion that an adoptive parent's parental rights do not fully vest for an unspecified period of time somewhere between three-and-a-half years and nine-and-a-half years after the adoption becomes final. As far as the facts, the guardian ad litem's recommendation rested on many of the same errors of fact relied on by the majority opinion. Moreover, it appears from the record that the guardian ad litem spent little or no time contemplating how custody and visitation could be arranged to encourage a strong parent-child relationship between Sidney and both her parents, which was, of course, the task assigned him by the trial court.

Furthermore, trial courts have a responsibility to make their own independent determinations regarding what custody and visitation arrangement will best serve the child's interests. A trial court cannot abdicate its responsibility to make the hard choices by deferring totally to the recommendations of a guardian ad litem and "the child's therapist." As explained above, the rest of the factual findings on which the trial court based its final judgment are clearly erroneous, leaving these two recommendations as the only support for the trial court's decision. Just as a trial court must not abdicate its responsibility to make an independent determination regarding the child's best interests in every child custody and visitation case, neither should this Court deprive a trial court of the opportunity to

---

[6] Ms. Whitaker was also Ms. Taylor's paid expert witness at trial and at the hearing where the court restricted Mr. Taylor to supervised visitation with Sidney. Ms. Whitaker then became the supervisor for the initial supervised visitation sessions between Mr. Taylor and Sidney. Ms. Whitaker's multiple roles raise serious conflict of interest issues.

[7] Ms. Whitaker's trial testimony also contradicted the visitation reports prepared by the company that replaced Ms. Whitaker as the supervisor for the visits between Mr. Taylor and Sidney in the months immediately preceding the trial.

fulfill that responsibility after rejecting every factual basis for the trial court's decision aside from the recommendations of others.

II. *The Majority Opinion Misconstrues the Actual Effect of the Final Judgment.*

The trial court did not, as the majority erroneously states, simply "den[y] [Mr. Taylor] any visitation" with his nine-year-old daughter Sidney. To the contrary, the trial court expressly found that "it is in the best interests of the minor child that she has [sic] no visitation *and no contact of any kind*" with Mr. Taylor. (Emphasis supplied.) The trial court repeated its "no contact" formulation twice more in the succeeding paragraphs of the final judgment. Not coincidentally, the trial court simultaneously terminated Mr. Taylor's child support obligation. The plain language of the final judgment bars Mr. Taylor not only from having any future in-person visitation with Sidney, but from participating in her life in any way. Under the terms of the final judgment, Mr. Taylor cannot communicate with his own child in any way, shape, fashion, or form. Mr. Taylor cannot talk to his daughter on the telephone. He cannot acknowledge her presence if he runs into her at the grocery store. He cannot attend any of her school or extracurricular functions. He cannot give her a Christmas present. He cannot write her a letter or even send her a card on her birthday.

There is no discernible endpoint to the onerous restrictions the trial court placed on Mr. Taylor's parental rights. The final judgment does not specify any conditions under which Mr. Taylor would be allowed to become involved in his daughter's life again. It does not say, for example, "If you do X, Y, and Z, you can resume talking to Sidney on the telephone." Given the facts of this case, it is difficult to imagine what those conditions might be. Stop using marijuana long enough that we can be sure your recovery is genuine? Mr. Taylor has already done that. Attend long-term counseling to help you find better ways to deal with your anger management issues? Check. Demonstrate your commitment to Sidney by paying child support regularly for at least a year? Done. Submit to limited, costly, and closely supervised visitation for months on end to prove you can behave yourself and interact appropriately with your child? Also done.

Nor is it any answer to say that Mr. Taylor can always ask the trial court to modify its "visitation" ruling in the future. In order to succeed, Mr. Taylor would have to demonstrate a material change in circumstances warranting reexamination of the initial determination regarding visitation. Mr. Taylor will not be able to satisfy this requirement by overcoming his addiction to marijuana, demonstrating his love for Sidney and his commitment to her consistently and in tangible ways, successfully completing extended counseling programs, behaving appropriately towards Sidney over the course of

long-term supervised visitati n, or securing an appropriate place for overnight visitation with Sid ey, because he has already done all these things. Moreover, the parent-child bond between Sidney and Mr. Taylor will only deteriorate with each passing day that he is not allowed to speak to her, write to her, or even see her.

The judgment affirmed by the majority opinion indefinitely bars all future interaction and communication between Mr. Taylor and Sidney under circumstances where there is no realistic possibility that the ban will ever be lifted in the future. If such a drastic disruption of an existing parent-child relationship by the government is not an infringement on a parent's constitutional right to the care and custody of his or her children, then that right is hollow indeed.

III. *The Court Should Not Countenance the Trial Court's Deliberate Subterfuge in Issuing a De Facto Termination of Parental Rights Order Disguised as a Judgment Barring All Visitation.*

If there were any remaining doubt about the trial court's intent in entering the final judgment upheld by the majority opinion, it is dispelled by a quick review of the guardian ad litem's statements to the court at trial. The guardian ad litem acknowledged that Mr. Taylor had certain legal rights as Sidney's adoptive parent but viewed them as being somewhat attenuated in light of the three-and-a-half-year duration of the parties' marriage. At trial, the guardian ad litem stood by the recommendation in his preliminary report that the trial court permanently sever the parent-child relationship between Sidney and Mr. Taylor. The guardian ad litem explained his reasoning as follows:

> You don't have a normal situation, [where] you have a mom and dad who had a biological child or adopted the child early on in their marriage, and had raised the child for nine and a half years. What you have is a child who was already raised to a certain point. Someone adopted her and now has legal rights to the child.[8]

The guardian ad litem conceded that "[l]egally, there's some question about what authority the Court has at this point to terminate" Mr. Taylor's parental rights. The guardian ad litem then proposed the following solution to this dilemma:

> But at least it would appear clear that the Court could, if not terminate the parental rights of Mr. Taylor, . . . so limit those

---

[8] When Ms. Taylor married Mr. Taylor, Sidney was just four years old. By the time of the divorce trial, Sidney was nine.

parental rights as to terminate the physical relationship between the child and the father.

In this way, the trial court could ensure that Sidney continued receiving monetary support from Mr. Taylor while making certain that Mr. Taylor would enjoy "no benefits of that relationship."

In response to the trial court's inquiry regarding its subject matter jurisdiction to terminate Mr. Taylor's parental rights in a divorce and child custody proceeding, the guardian responded that there "is a specific case, an older case, that says in a divorce case the Judge cannot terminate the parental rights." The guardian ad litem suggested that the holding in that case was not necessarily binding, however, because of a recent decision from the Supreme Court of Georgia allowing a superior court to terminate a parent's parental rights, "or at least address that issue," in the context of a divorce proceeding. Incredibly, the trial court's final judgment does not even mention the jurisdictional issue.

The "older case" to which the guardian ad litem referred is *Cothran v. Cothran*, 237 Ga. 487 (228 SE2d 872) (1976). In *Cothran*, we held unequivocally that "[a] superior court judge, upon hearing a divorce and child custody case, does not have jurisdiction to terminate parental rights." It was an easy case. The governing statute, OCGA § 15-11-28 (a) (2) (C), provides in relevant part as follows:

> Except as provided in subsection (b) of this Code section [involving criminal jurisdiction], the [juvenile] court shall have exclusive original jurisdiction over juvenile matters and shall be the sole court for initiating action . . . [i]nvolving any proceedings . . . [f]or the termination of the legal parent-child relationship . . . other than that in connection with adoption proceedings under Chapter 8 of Title 19, in which the superior courts shall have concurrent jurisdiction to terminate the legal parent-child relationship and the rights of the biological father. . . .

The General Assembly has wisely chosen not to amend the statute to allow parents to inject the possibility of termination of parental rights into divorce and child custody proceedings, which are contentious enough without adding this additional explosive element. The rule of *Cothran* has been repeatedly reaffirmed by both this Court and the Court of Appeals in an unbroken line of cases stretching from *Cothran* to the present day.

The "recent case" the guardian ad litem felt was sufficient to call into question the plain meaning of the statute, as well as the substantial and unbroken line of cases interpreting the statute to

mean precisely what it says, was another case styled *Taylor v. Taylor*, 280 Ga. 88 (623 SE2d 477) (2005) (opinion by Sears, C. J.). In *Taylor*, a superior court sitting in a divorce and child custody case held that it had no choice but to terminate a father's parental rights based on a prior voluntary agreement to surrender his parental rights under OCGA § 19-7-1 which he now wished to repudiate. On appeal, we held that the father's prior voluntary agreement did not tie the trial court's hands in this manner. We stated that it was incumbent on the trial court to make an independent determination regarding whether severance of the parent-child relationship was in the best interests of the child regardless of any prior agreement by the father. No issue regarding the superior court's jurisdiction was raised in that case, much less decided. It is axiomatic that the decisions of this Court do not stand for propositions that were neither raised by the parties nor addressed in the Court's opinion.[9] Thus, our 2005 decision in *Taylor v. Taylor* did not expand or contract the subject matter jurisdiction of the superior courts, either explicitly or by implication, and the trial court had no jurisdiction to entertain Ms. Taylor's request to terminate Mr. Taylor's parental rights.

This case started out as a divorce and child custody case. It did not become a termination of parental rights case until May 8, 2006, when Ms. Taylor amended her complaint to add a request that the trial court terminate the parent-child relationship between Sidney and Mr. Taylor. The trial started less than a month later, on June 6, 2006. The idea that Mr. Taylor's parental rights might end up being terminated as a result of these proceedings was not on anyone's radar screen, and certainly not Mr. Taylor's, until a couple months before Ms. Taylor amended her complaint when the guardian ad litem issued his preliminary report to the trial court. In the preliminary report, the guardian ad litem recommended that Mr. Taylor's parental rights with respect to Sidney be completely severed. In essence, the guardian ad litem wanted the superior court in the divorce case to undo the adoption the same superior court had approved four years earlier when the parties were still married.

The effect of this wholly unexpected recommendation on the course of this litigation cannot be overstated, as this bombshell distorted everything that happened in its wake. The focus of the entire proceeding shifted dramatically. The vast majority of the testimony and evidence presented during this five-day bench trial related to whether Mr. Taylor's parental rights should be terminated

---

[9] Cf. *Shousha v. Matthews Drivurself Svc.*, 210 Tenn. 384, 390 (358 SW2d 471) (Tenn. 1962) ("It is a familiar law that a decision is authority for the point or points decided, and nothing more. . . .").

rather than how child custody and visitation could best be structured to facilitate a strong parent-child bond between Sidney and both her parents. The many obvious alternatives to the trial court's draconian no contact order that could have been explored during this time never were. The majority offers no justification for the trial court's failure to try or even consider a course of action less drastic than complete severance of all communication between Sidney and her father. Had these alternatives been explored and found wanting, or tried unsuccessfully, this would be a very different case. As it stands, there appears to have been no consideration at all given to the possibility that protecting Mr. Taylor's parental rights might be fully consistent with Sidney's best interests.

IV. *The Majority Opinion Ignores the Fact that Mr. Taylor Has Been Treated Differently Solely Because He Is Sidney's Adoptive, Rather than Biological, Father.*

Ms. Whitaker, the person described by the majority as "the child's therapist," first recommended that Mr. Taylor's parental rights be terminated only after the guardian ad litem made the same recommendation. However, she admitted on cross-examination that she would "probably not" be recommending termination if Mr. Taylor were the child's biological father instead of her adoptive father. The guardian ad litem appears to have made the same mistake, as his statements at trial recited above demonstrate. In fact, the notion that the parental rights of adoptive parents stand on a lesser footing than those of biological parents pervades the record in this case, from the testimony of Ms. Taylor's expert witness to the arguments of both Ms. Taylor's counsel and the guardian ad litem appointed by the trial court.

Mr. Taylor validly adopted Sidney as his own child with Ms. Taylor's express consent in 2002, three years before the parties separated. The period following a valid, legally binding adoption of a minor child is not some sort of trial run to see if the parent-child relationship takes, as Ms. Taylor's expert witness, Ms. Taylor's trial counsel, and the guardian ad litem seemed to have believed. It is a conclusive change of constitutional magnitude in the legal status of the adoptive parent, the child, and any non-adoptive parent.

Until today, the law of Georgia was clear that when a man adopted a child, he became that child's "real" father. An adoptive father like Mr. Taylor enjoyed the full panoply of rights and obligations the law accords to biological fathers. Both the trial court and the majority appear to have lost sight of these bedrock legal principles. I am at a loss to conceive of any explanation for the trial court's de facto termination of Mr. Taylor's parental rights other than the legally irrelevant circumstance that Mr. Taylor became Sidney's father

through adoption rather than biological reproduction. It is imperative for this Court to strengthen the bonds between adoptive parents and children whenever possible. The majority opinion instead weakens these bonds, thereby undercutting the law's historic promotion of family relationships.

I am authorized to state that Presiding Justice Hunstein joins in this dissent.

DECIDED JUNE 4, 2007.

*Michael E. Manely, Stephanie L. Steele*, for appellant.
*Browning & Smith, Thomas J. Browning, Tyler J. Browning*, for appellee.