S10F1703, S10A1707. MILLER v. MILLER (two cases).

(705 SE2d 839)

CARLEY, Presiding Justice.

In 2007, Lori Kutner Miller (Wife) brought this divorce action against Alan Brad Miller (Husband), who filed an answer and counterclaim for divorce. After a bench trial, the trial court entered a divorce decree on May 21, 2009, resolving most issues, including alimony for support of Wife and custody and support of the parties' two minor children, but reserving the issues of attorney fees and guardian ad litem fees. In relevant portions of that decree, the trial court found that all of the parties' real property, including the marital residence and a lot on Amelia Island, is marital property and that the profits from the sale thereof would be equally divided. The trial court also accepted the valuation by Wife's expert of Husband's internal medical practice at $331,214 using combinations of the asset approach, market approach, and income approach, and awarded Wife one-fourth of that value, or $82,803.50, payable in 24 monthly "business alimony" installments of $3,450.14 each.

A motion for new trial was filed on June 15, 2009 and denied on November 17, 2009. Wife thereafter filed a motion for attachment of contempt, amending it twice, and also filed a motion for clarification. On March 16, 2010, the trial court entered separate orders awarding fees to the guardian ad litem and awarding attorney fees in favor of Wife in the amount of $60,000. On March 17, 2010, the trial court entered an order granting the motion for clarification and correcting clerical errors and separately entered an order finding Husband in contempt of the divorce decree. In Case Number S10F1703, Husband appeals from the divorce decree and the orders other than the contempt order pursuant to the grant of a discretionary appeal under this Court's Pilot Project. In Case Number S10A1707, Husband appeals from that contempt order pursuant to our grant of his application for discretionary appeal. The two cases are hereby consolidated for disposition in this single opinion.

*Case Number S10F1703*

1. In several enumerations of error, Husband challenges the trial court's valuation of his business in the amount of $331,214.

> "The valuation of a professional business practice presents unique issues not encountered in conventional businesses. Generally, the professional practice's most valuable asset is its goodwill. . . . However, this value is more difficult to quantify." [Cits.]

*May v. May*, 589 SE2d 536, 541 (III), fn. 7 (W. Va. 2003). " '[T]hree principal methods . . . can be used for developing a value for ownership in a closely held corporation. . . .' [Cit.] Those are the income or capitalized earnings method, the market approach method, and the cost approach method. [Cit.]" *Steneken v. Steneken*, 873 A2d 501, 505 (II) (N.J. 2005). Wife's expert, who is a forensic accountant and business valuation analyst, utilized all three approaches, referring to the latter as the asset approach, pursuant to which she capitalized "excess earnings," whereas she capitalized total earnings when using the income approach. She weighted each approach differently, after analyzing how appropriate each one is for Husband's practice. " '[V]aluation is an art rather than a science (that) . . . requires consideration of proof of value by any techniques or methods which are generally acceptable in the financial community and otherwise admissible in court.' [Cit.]" *Steneken v. Steneken*, supra. Indeed, we have held that not even a buy-sell agreement is binding when valuing a closely-held corporation for purposes of equitable division. *Barton v. Barton*, 281 Ga. 565 (639 SE2d 481) (2007). "The facts upon which an expert bases his or her opinion are admissible on either direct or cross-examination, and such bases go to the weight given the testimony by the [factfinder], rather than to its admissibility." *Popham v. Popham*, 278 Ga. 852, 853 (3) (607 SE2d 575) (2005).

"[T]here is no single best approach to valuing a professional association or practice, and various approaches or valuation methods can and have been used. [Cits.]" *Poore v. Poore*, 331 SE2d 266, 270 (N.C. App. 1985). "[G]oodwill may be measured by any legitimate method of evaluation that measures its present value by taking into account some past result, so long as the evidence legitimately establishes value. [Cit.]" Barth H. Goldberg, *Valuation of Divorce Assets, Revised Edition* § 8:4. It is not required that "only one method be used in isolation." *In re Marriage of Hall*, 692 P2d 175, 180 (Wash. 1984). See also *Skrabak v. Skrabak*, 673 A2d 732, 737 (I) (Md. App. 1996); Martin J. McMahon, *Valuation of Goodwill of Professional Practice for Distribution on Divorce*, 8 AmJur. Proof of Facts 3d 215, § 3 (1990) (citing *In re Marriage of Hall*, supra).

The decision as to which valuation method to rely on is a factual determination to be made by the trial court. A trial

> court may select the valuation of property presented by one party over the valuation offered by the other, or assess value based upon its own calculations. The weight to be given to valuation techniques used by experts is for the trial court to decide. [Cit.]

Goldberg, supra at § 8.3 (quoting from *In re Marriage of Nevarez*, 170 P3d 808, 812 (II) (A) (2), (3) (a) (Colo. App. 2007)).

Husband argues that use of the market approach was inappropriate because there is no market for solo medical practices, and that the trial court improperly excluded certain testimony to that effect. Any error in that exclusion was harmless because the excluded testimony was cumulative of other evidence. As Husband states in his appellate brief, two other witnesses testified that there was no market for solo medical practices. That evidence was contradicted by Wife's expert testimony. Wife's expert testified that she used two national databases and that utilization of such databases is a generally accepted method for valuing medical practices. Indeed, many states treat the market approach as one of several possible approaches for valuing a professional practice and its goodwill. Christopher A. Tiso, *Present Positions on Professional Goodwill: More Focus or Simply More Hocus Pocus?*, 20 J. Am. Acad. Matrim. Law 51, 65 (III) (D) (2006). See also Goldberg, supra. "[I]n recent years, the overall marketability of medical practices has been increasing." 2 Brett R. Turner, *Equit. Distrib. of Property, 3d* § 6:73 (the law looks to "value at a sale in the due course of business, even if [it] might require some expenditure of time and effort in order to find a suitable buyer"). The differences in geographical locations and dates of sale go to the weight, rather than admissibility, of the comparable sales on which Wife's expert relied. See *Popham v. Popham*, supra; *Jones v. Chatham County Bd. of Tax Assessors*, 270 Ga. App. 483, 486 (3) (606 SE2d 673) (2004); 2 Turner, supra at § 7:26.

Husband contends that the trial court erroneously capitalized the excess earnings of the practice even though he was paying himself close to a normal salary for someone in his position, leaving no excess earnings. This contention shows a fundamental misunderstanding of such capitalization of excess earnings, which is the most commonly relied upon method for valuing professional practices. *May v. May*, supra at 548 (III) (D), fn. 18; Tiso, supra at 61 (III) (A). See also *In re Marriage of Nevarez*, supra at 812 (II) (A) (2). Under that method as applied by Wife's expert, the first step in determining the value of the practice's intangible assets is to deduct the owner's reasonable salary or an average salary for similar persons in the same field from the average net income of the practice, not from the

actual salary paid to the practitioner. *May v. May*, supra at 548 (III) (D); Tiso, supra. In this way, the amount of excess earnings is properly adjusted for those practices which increase or decrease their retained earnings by means of a lower or higher salary for the practitioner than is normal. The mere fact that the practitioner is paid a normal salary hardly means that there are no excess earnings in the practice.

Husband urges that the trial court erroneously divided his future earnings by accepting valuation methods which involve the capitalization of earnings. With respect to the capitalization of excess earnings, " '[t]his criticism is entirely unjustified. By capitalizing only the excess earnings of the owning spouse, the excess earnings method actually excludes most future earnings from consideration.' " Tiso, supra at 62 (III) (A). See also *Skrabak v. Skrabak*, supra at 737 (I), fn. 5; 2 Turner, supra at § 7:23. That " 'method is an appropriate valuation in a [divorce] proceeding because it provides the present value of the [business] interest . . . and "avoids the problem of valuing a business on the basis of post-divorce earnings and profits." ' [Cits.]" *In re Marriage of Nevarez*, supra. Similarly, straight capitalization of total earnings does not divide future earnings, but rather "measures the present value of the business by reference to its potential to produce future income." Courtney E. Beebe, Casenote, *The Object of My Appraisal: Idaho's Approach to Valuing Goodwill as Community Property in Chandler v. Chandler*, 39 Idaho L. Rev. 77, 90 (II) (B) (3) (2002). Most courts would accept that method especially where, as here, the appraiser makes appropriate modifications for taxation as a Subchapter S corporation and for any "individual" goodwill, excludes annual income representing reasonable compensation for services, and capitalizes actual past earnings instead of estimated future earnings based upon a future growth rate. 2 Turner, supra at § 7:27.

Contrary to Husband's further argument, the trial court did not erroneously count his income twice by awarding portions of his business in the support awards and again in the property division as "business alimony." Under both capitalization methods, Wife's expert "deducted a reasonable salary expense for [Husband]. . . . With the separate bases for the alimony award and the property division clearly acknowledged before the court . . . , we find no double dipping here." *Adlakha v. Adlakha*, 844 NE2d 700, 706 (1) (Mass. App. 2006). In applying the child support guidelines, the trial court did clearly use all of Husband's income, including both his salary and business income. The broad definition of gross income in OCGA § 19-6-15 (f), particularly self-employment income as defined in OCGA § 19-6-15 (f) (1) (B), does not exclude income which was considered in placing a value on a business which was the subject of equitable division. We join those

courts which "have rejected outright a double-dipping claim [with respect to] child support, reasoning that as between parent and child, the . . . asset subject to property division is not being counted twice. [Cits.]" *Steneken v. Steneken*, 843 A2d 344, 351 (N.J. Super. 2004), aff'd as modified, *Steneken v. Steneken*, 873 A2d, supra. See also *In re Marriage of Cook*, 560 NW2d 246, 252-254 (III) (Wis. 1997); *In re Marriage of Klomps*, 676 NE2d 686, 689-690 (Ill. App. 1997).

Husband further asserts that the trial court erred when it divided professional goodwill, because that asset is not marital property.

> [E]nterprise [or commercial] goodwill . . . is transferred whenever the enterprise to which it attaches is bought and sold . . . as an ongoing concern. . . . [I]ndividual [or personal] goodwill . . . is not transferable when the enterprise is bought and sold, and . . . instead resides primarily in the personal reputation of the owner. The strong general rule is that enterprise goodwill must be included when valuing a business entity [as marital property].

2 Turner, supra at § 6:73.

> Case law on treatment of individual goodwill in divorce cases is divided. One line of cases holds that all forms of goodwill must be included in determining the value of the business for purposes of equitable distribution. A second line of cases holds that individual goodwill cannot be so included.

2 Turner, supra at § 6:74. At this time, "[t]he majority of states hold that personal goodwill cannot constitute marital property whereas enterprise goodwill can." Tiso, supra at 57 (II) (C). See also 2 Turner, supra. Husband uses the more ambiguous term "professional goodwill." See *May v. May*, supra at 541 (III) (B). If by that term he includes enterprise goodwill and means that none of the goodwill of a professional practice can be divided, we resolve this enumeration by following the vast majority of jurisdictions and including enterprise goodwill in the valuation of a professional practice as part of marital property. 2 Turner, supra at § 6:73. If, as is more likely, Husband is contending that the trial court divided individual goodwill, we resolve this contention by assuming for purposes of this appeal only that individual goodwill does not constitute marital property in Georgia and by observing as explained below that the trial court, in accepting the testimony of Wife's expert, in fact excluded individual goodwill from its valuation of the practice.

"[I]t is clear today that a determination of good will is a question of fact and not of law." Goldberg, supra at § 8:4. See also *Gomez v. Gomez*, 168 SW3d 51, 55 (Ky. App. 2005); 2 Turner, supra. "[I]t must always be recognized that there is no precise formula for this determination and that even though it is difficult, it must be undertaken in each [divorce] matter where applicable [cits.] . . ." Goldberg, supra. Wife's expert testified that a "key man discount" was not applicable to Husband's practice because he could be replaced by another internal medicine doctor, and that the fact that some patients might not return was taken into account by use of the market approach and by use of a higher capitalization rate resulting in a lower value. A key person discount is one method of quantifying personal goodwill. Bernard I. Agin, *Failure to Understand Asset Types*, in Nat. Business Institute, Preventing Critical Financial Mistakes During Divorces (2007). When a market approach is used, "the 'key man' discount or personal goodwill has already been recognized and adjusted for in the purchase price" of the comparable practices. Agin, supra. Under the other valuation approaches, adjustment of the capitalization rate by Wife's expert was an appropriate means of reflecting the risk that some patients would not return, such that a key man discount or similar deduction would have overemphasized personal goodwill by factoring it into the calculations twice. *Hough v. Hough*, 793 S2d 57, 58-59 (Fla. App. 2001). See also *Wilson v. Wilson*, 277 Ga. 801, 806 (4) (596 SE2d 392) (2004) ("trial court may not exclude expert testimony on value, offered by Wife, merely because Husband believes that [certain] discounts are necessary").

The trial court's valuation of Husband's business, including goodwill, was sufficiently supported by probative expert testimony. Where, as here, it appears on appeal " 'that the trial court reasonably approximated the net value of the practice and its goodwill, if any, based on competent evidence and on a sound valuation method or methods, the valuation will not be disturbed.' [Cits.]" *May v. May*, supra at 549 (III) (D). Furthermore, contrary to Husband's contention, the label of "business alimony" given by the trial court to the payments required as a result is not controlling. Because the divorce decree here states the exact number and amount of payments without other limitations or contingencies, as well as the gross amount to be paid, the award clearly is in the nature of an authorized property settlement. *Rivera v. Rivera*, 283 Ga. 547, 548-549 (661 SE2d 541) (2008). "Goodwill need not be divided in a single lump sum." 2 Turner, supra at § 7:23.

2. Husband claims that the trial court erroneously failed to find that the "source of funds" used for acquiring the marital residence

and the Amelia Island lot was his separate property. See *Hubby v. Hubby*, 274 Ga. 525 (556 SE2d 127) (2001).

> In general, the question of whether "a particular item of property actually is a marital or non-marital asset may be a question of fact for the trier of fact." [Cit.] Furthermore, "(t)he standard by which findings of fact are reviewed is the 'any evidence' rule, under which a finding by the trial court supported by any evidence must be upheld." [Cit.]

*Bloomfield v. Bloomfield*, 282 Ga. 108 (1) (646 SE2d 207) (2007).

Husband contends that the source of funds for the purchase of the marital residence and the Amelia Island lot was a prior residence purchased with premarital funds prior to marriage. As the trial court found, however, that prior residence was deeded into both parties' names after the marriage, and Wife testified that the purpose thereof was to give her ownership because of her contributions to the household. Thus, the trial court was authorized to find that the prior residence was thereby transformed into marital property. *Lerch v. Lerch*, 278 Ga. 885, 886 (1) (608 SE2d 223) (2005).

Moreover, other "evidence supported the trial court's conclusion that Husband did not use his own personal funds to make the down payment on the [marital] home." *Walton v. Walton*, 285 Ga. 706, 707 (1) (681 SE2d 165) (2009). Although Husband argues that the down payment was made with business funds which were subsequently replaced by the proceeds from the sale of the prior residence, the evidence showed that both parties were the sellers of the prior residence, that instead of being deposited into a business account the proceeds were deposited into the parties' joint operating account and thereby commingled with the funds therein, and that Husband conveyed the new marital residence to both parties on the day it was purchased. See *Walton v. Walton*, supra; *Lerch v. Lerch*, supra. Compare *Bloomfield v. Bloomfield*, supra at 110 (1) (c).

Wife's pre-trial admission that Husband used the proceeds from the sale of the prior residence as a down payment on the new marital residence is not dispositive, because, among other things, that admission does not constitute proof that the prior residence was separate property. In any event, the trial court tacitly permitted withdrawal of the admission by allowing evidence that the proceeds were deposited into the parties' joint account and by considering that conflicting evidence on the merits. See *SAKS Assoc. v. Southeast Culvert*, 282 Ga. App. 359, 364-365 (2) (638 SE2d 799) (2006).

Furthermore, the parties borrowed against the equity in the marital residence to purchase the Amelia Island lot. Accordingly, since "evidence supported the trial court's conclusion that Husband

did not make a nonmarital contribution to the purchase of the [new] marital home, [which became joint marital property,] that determination will not be disturbed here. [Cit.]" *Walton v. Walton*, supra.

3. Husband further contends that the evidence does not support the award of attorney fees. As the trial court recognized, Wife moved for attorney fees pursuant to both OCGA §§ 19-6-2 (a) (1) and 9-15-14 (b). In its order, the trial court awarded Wife significantly less than she had incurred and made findings which would support an award under either statute. See *Carson v. Carson*, 277 Ga. 335 (588 SE2d 735) (2003).

The trial court made the award of attorney fees after its prior extensive consideration of the parties' financial circumstances, which it summarized in its order and weighed along with the evidence at trial, the awards in the decree, interim fee awards, the extent of Wife's need, and other equitable factors. Thus, we find no abuse of the trial court's discretion under OCGA § 19-6-2 (a) (1) to ensure effective representation of both spouses for a full and fair resolution of all issues. See *Walton v. Walton*, supra at 708 (3); *Arkwright v. Arkwright*, 284 Ga. 545, 547 (2) (c) (668 SE2d 709) (2008).

Under OCGA § 9-15-14 (b), a trial court may award attorney fees against any party who has acted to cause delay or harassment or who has unnecessarily expanded the litigation by improper conduct including discovery abuses. In its order, the trial court recounted several instances of Husband's misconduct during the litigation and found that they caused numerous delays, extra motions, and extra conversations and forced Wife's counsel to make multiple requests for documents and answers and to go to otherwise unnecessary efforts to obtain needed documents. "Although [H]usband argued that such events did not occur or that they were justifiable, the trial court was authorized to resolve conflicts in the evidence. [Cit.]" *Carson v. Carson*, supra at 337 (2). "Husband's failure to question Wife's counsel or seek more information waived his complaint regarding" which alleged actions caused Wife to incur $60,000 in attorney fees. *Taylor v. Taylor*, 282 Ga. 113, 115 (3) (646 SE2d 238) (2007). "Our review of the record demonstrates that the court properly exercised its discretion in awarding attorney fees under OCGA § 9-15-14 (b)." *Carson v. Carson*, supra.

4. Husband asserts that the trial court erred by entering a clarification order, outside the term of court at which the May 21, 2009 divorce decree was entered, which granted substantive rights and did not correct mere clerical errors pursuant to OCGA § 9-11-60 (g).

"After the term in which a final decree of divorce is rendered, the court is without power to modify or amend the decree in any

matter of substance or in any matter affecting the merits . . . . [Cit.]" *Leggette v. Leggette*, 286 Ga. 323-324 (1) (687 SE2d 585) (2009). However, where, as here, "a divorce is granted . . . by an order which leaves other issues for decision in the trial court, it is an interlocutory, not a final, order." *Carr v. Carr*, 238 Ga. 197 (232 SE2d 69) (1977). See also *Miller v. Miller*, 282 Ga. 164, 165 (646 SE2d 469) (2007). "In civil cases, ' "an interlocutory ruling does not pass from the control of the court at the end of the term if the cause remains pending." (Cits.)' [Cit.]" *Moon v. State*, 287 Ga. 304 (696 SE2d 55) (2010).

Thus, the fact that the term during which the divorce decree was entered expired prior to entry of the clarification order "is of no consequence . . . ." *CSX Transp. v. Deen*, 278 Ga. App. 845, 847 (630 SE2d 119) (2006). There was no final judgment until the reserved issues of attorney fees and guardian ad litem fees were resolved on the day before the clarification order. Therefore, the rule against amending or modifying a judgment out of term had no application to the May 21, 2009 divorce decree. *Hubbert v. Williams*, 175 Ga. App. 393, 395 (1) (333 SE2d 425) (1985). That rule also did not apply to the clarification order, because it was entered during the same term in which final judgment was rendered. As a result, "our entering the fray by determining whether or not this was the type clerical mistake correctible under [OCGA § 9-11-60 (g)] would be wholly superfluous." *Hubbert v. Williams*, supra.

### Case Number S10A1707

5. Husband contends that there was insufficient evidence for the trial court to hold him in criminal contempt for violating its requirement that he refrain from making any disparaging remarks about the other parent in the presence of the children. That portion of the contempt order was based on seven statements which the trial court found had been made by Husband. The only evidentiary basis specified by the trial court for those findings was Husband's repeated assertions of his privilege against self-incrimination in response to numerous questions at the contempt hearing. Indeed, adverse inferences from invocations of that privilege clearly form the sole possible evidentiary basis for the trial court's findings as to six out of the seven statements. The trial court stated that, in a civil case, it "can draw an adverse inference against a witness who asserts such a privilege. See *Brewer v. Brewer*, 249 Ga. 517 [(1) (291 SE2d 696)] (1982); *Simpson v. Simpson*, 233 Ga. 17 [(209 SE2d 611)] (1974); see also OCGA § 19-11-135 (h)." (Contempt order, p. 3, fn. 2.) Husband takes issue with application of that principle in the context of criminal contempt.

As *Simpson*, supra at 20, itself recognized, "no inference of guilt can be drawn from a privileged refusal to testify in a criminal case. . . ." "Criminal contempt is a crime in the ordinary sense, requiring proof of the elements of the alleged contempt . . . beyond a reasonable doubt. [Cits.]" *Cousins v. Macedonia Baptist Church*, 283 Ga. 570, 575 (2) (662 SE2d 533) (2008). Thus, the Supreme Court of the United States "throughout the twentieth century has ruled that an individual could not be subject to a criminal contempt sanction unless the individual was provided with the privilege against self-incrimination . . . . [Cits.]" 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Const. L.* § 17.9 (a) (i), fn. 1 (4th ed.). See also Bailey & Fishman, *Handling Misdemeanor Cases* § 12.2 (2d ed.). " '[I]t is certain that in proceedings for criminal contempt the defendant . . . cannot be compelled to testify against himself.' [Cits.]" *Bloom v. Illinois*, 391 U. S. 194, 205 (II) (88 SC 1477, 20 LE2d 522) (1968). See also *Schiselman v. Trust Co. Bank*, 246 Ga. 274, 278 (2) (271 SE2d 183) (1980).

Accordingly, the trial court's findings regarding Husband's disparaging remarks in the presence of the children were overwhelmingly premised on constitutionally improper inferences. "Given the infirmities of the 'evidence' used to support the finding of [criminal contempt], we cannot conclude that this finding was established to the requisite quantum of proof." *Cousins v. Macedonia Baptist Church*, supra. Accordingly, the trial court's adjudication of criminal contempt must be reversed. *Cousins v. Macedonia Baptist Church*, supra. Remaining enumerations of error with respect to that adjudication are moot. The other portions of the contempt order are unaffected.

*Judgment affirmed in Case Number S10F1703. Judgment affirmed in part and reversed in part in Case Number S10A1707. All the Justices concur.*

DECIDED NOVEMBER 22, 2010.

*Vernis & Bowling, Tamar O. Faulhaber*, for appellant.
*Stern & Edlin, Gary P. Graham*, for appellee.