**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 2, 2015**

# In the Court of Appeals of Georgia

A15A1541, A16A0061. SMITH v. PEARCE.

BARNES, Presiding Judge.

Melissa Kay Smith appeals the superior court's order granting John Blake Pearce's petition for legitimation and custody of the parties' minor child, T. C. F. Smith also appeals the court's denial of her motions to dismiss, its award of OCGA § 9-15-14 attorney fees to Pearce, and its order finding her in contempt for failing to pay those fees. For reasons that follow, we affirm the legitimation and custody ruling, but we vacate the attorney fee award and remand for further proceedings. We also vacate the contempt award.

"When reviewing a superior court's custody ruling, we view the evidence in the light most favorable to the trial court's decision." *Strickland v. Strickland*, 330 Ga. App. 879 (769 SE2d 607) (2015). So viewed, the record shows the following relevant facts.

Pearce and Smith dated in high school from 2005 to 2007, but broke up in college. Smith began dating Cole Fahey in 2009 and got engaged to him in November of that year. The engagement soon ended, however, and in December 2009 Smith visited Pearce and was intimate with him. Shortly thereafter, she reconciled with Fahey. In January 2010, Smith learned that she was pregnant, and she married Fahey the following month. T. C. F. was born in September 2010. Fahey is listed on T. C. F.'s birth certificate as the father, and he believed that he was, in fact, T. C. F.'s biological father.

In early 2011, Smith, Fahey, and T. C. F. moved to Florida because Fahey, who serves in the military, was stationed there. The relationship between Smith and Fahey grew rocky, culminating in a fight in June 2011 in which Fahey broke down a door and injured Smith's leg. After the fight, Smith left Fahey because she was afraid for him to be around T. C. F., and she and the baby went to live with her mother. Smith reported the fight to Fahey's commanding officer, who ordered Fahey to take anger management classes. Fahey later filed for divorce in Florida.

Meanwhile, before moving to Florida with Fahey, Smith had contacted Pearce "trying to get back together." Smith introduced Pearce to T. C. F. and said that she wished Pearce – rather than Fahey – had fathered the baby. After moving to Florida,

2

Smith regularly called Pearce, and after leaving Fahey, she once again sought him out. Although Smith was still married to Fahey, she once again became intimate with Pearce, telling him that she and Fahey were separated and that he had abused her.

In September 2011, at Smith's urging, Pearce took a drug-store paternity test, which showed with 99.99% certainty that he was T. C. F.'s biological father. Pearce eagerly accepted T. C. F. as his son, and both Smith and Pearce told their families and friends the news. Pearce leased a townhouse in Sandy Springs, and Smith and T. C. F. moved in with him in what Smith described as an effort to have "a nice, happy, normal family." Pearce assisted with childcare and paid the rent, utilities, and food expenses, as well as half of T. C. F.'s preschool tuition.

Smith and Fahey's divorce became final in March 2012. During the course of the proceedings, Fahey had taken a paternity test that ruled him out as T. C. F.'s biological father. Accordingly, the Florida circuit court's divorce judgment provided as follows:

> There was one child born during the marriage, [T. C. F.], born September 10, 2010, age 1 year. Genetic testing has revealed that the Husband is not the biological father of the minor child. The Wife states that John Pierce [sic] is the biological father of the minor child. By stipulation of the parties, the Husband, Cole D. Fahey, shall have no parental rights or responsibilities regarding the minor child, [T. C. F.].

3

Smith claims that her relationship with Pearce began deteriorating in March 2012 and that he raped her in June 2012, but she did not report the alleged rape to the police or anyone else. Afterward, Smith continued to live with Pearce, texted him that she loved him, and proceeded with a previously-booked cruise she had bought for Pearce as a Father's Day present. She and Pearce discussed him legitimating T. C. F., and although Smith claimed to support that process, she did not cooperate with completing the necessary paperwork.

Smith began seeing Fahey again surreptitiously. In October 2012, she told Pearce she was spending the weekend with college friends, but instead she traveled to Mississippi to attend a military ball with Fahey. Pearce cared for T. C. F. while Smith was away. Smith alleges that when she returned from the trip, T. C. F. told her, "Dada kiss my pee-pee." Smith claims that she immediately confronted Pearce, who failed to allay her concerns. Pearce denies that the incident occurred or that Smith confronted him about it. Smith did not report T. C. F.'s alleged statement to the police, Georgia's Department of Family and Children Services ("DFCS"), or anyone else until eight months later. After the alleged touching, she continued to live with Pearce and to leave T. C. F. alone with him.

In November 2012, Pearce hired a lawyer and filed this petition for legitimation and custody. Later that month, he moved out of the townhouse because he had learned that Smith was seeing Fahey again and he and Smith were not getting along well. Pearce moved into a house nearby and set up one of the bedrooms for T. C. F. Smith told Pearce that she would get an apartment in Atlanta, and the two agreed to separate on good terms and share parenting time. At one point, Smith texted Pearce, "[I]t's important for you to be in [T. C. F.'s] life regularly." But in early December 2012, after Smith learned that Pearce had hired a lawyer, she emailed him that he could have no contact with her or T. C. F. until she, too, had retained counsel. Then, unbeknownst to Pearce, Smith withdrew T. C. F. from preschool, quit her job, left Atlanta, and moved back to her mother's house with T. C. F. Four weeks later – again without telling Pearce – Smith remarried Fahey.

For the next 18 months, Pearce did not know where Smith and T. C. F. were. He sent her multiple email and text messages asking about T. C. F., but she did not respond. He called the police and DFCS, to no avail. The sheriff's department was unable to serve Smith with the summons and complaint , so Pearce hired private investigators and special process servers, who also were unable to find Smith and T. C. F. Smith entered a limited appearance in this case and moved to dismiss the

petition, but the superior court denied her motion, finding that she had purposely evaded service, and authorized Pearce to serve her by publication. Smith appealed that ruling to this Court, but we dismissed the appeal as premature. See *Smith v. Pearce*, Case No. A14A0298, decided August 7, 2014. Smith later filed another motion to dismiss in the superior court, this time arguing lack of subject matter jurisdiction, but the court also denied that motion.

In April 2013, Smith, Fahey, and T. C. F. moved to Florida for Fahey's job. That July, Smith reported T. C. F.'s alleged November 2012 molestation outcry to a family therapist, who found nothing to substantiate the molestation allegations. Nonetheless, as a mandatory reporter, the therapist contacted Florida's Child Protective Services, which investigated but found no indication that T. C. F. had been molested. The Florida agency also contacted DFCS, which apparently conducted its own investigation and likewise found no evidence of molestation.

In January 2014, Pearce married a woman with a young daughter, whom Pearce has since adopted. The family lives in a comfortable home, and Pearce has a stable job. Both Pearce and his wife want T. C. F. to join their family.

Beginning in February 2014, the case proceeded to a bench trial that spanned four days over a seven-month period. During the trial, the superior court entered

6

interim orders permitting Pearce to have contact with T. C. F. for the first time in 18 months. Pearce began communicating regularly with the boy through Skype and Facetime, and he traveled several times to Virginia, where Smith and Fahey now live, for visitation, which initially was supervised at Smith's demand and Pearce's expense. During their first Facetime interaction, although T. C. F. immediately recognized Pearce and seemed happy to speak with him, T. C. F. repeatedly told Pearce, "You're shit"; in a later visit, he called Pearce stupid. In addition, Pearce testified that Smith and Fahey tried to undermine his relationship with T. C. F. by cutting communications short, sending him to planned visits exhausted and hungry, telling him that Pearce or the police would take him away from Smith and Fahey, and forbidding him from hugging Mrs. Pearce.

In April 2014, before his first in-person visits with T. C. F., Pearce submitted to court-ordered psychological and psychosexual evaluations.[1] After multiple days of interviews and testing, paid for largely by Pearce, the psychosexual evaluator concluded that there was no evidence that Pearce was sexually interested in children

---

[1] Earlier, Smith had moved for a court order compelling Pearce to submit to a psychosexual evaluation, but the court denied her motion without prejudice. Smith later filed an amended motion for an evaluation, to which Pearce consented so that he could see T. C. F.

or had molested T. C. F.[2] The psychologist described Pearce as a "well-functioning individual" with no clinical disorders and "many characteristics that are likely to produce positive parenting including his intellect, his ability to earn an income and provide stability, his obvious concern and caring for his son, and his desire to be a parent." Despite these reports, however, Smith testified that she still has concerns about T. C. F. being alone with Pearce. She apparently has enlisted other criminal and social services agencies to undertake further investigation, and she plans to take T. C. F. to a hospital that specializes in testing for sexual abuse in young children.

Following the bench trial, the superior court entered an order declaring T. C. F. to be Pearce's legitimate child, ordering his surname to be changed to Pearce, and awarding Smith and Pearce joint legal custody of the boy, with Pearce having primary physical custody. The court found that Pearce was a loving father who appeared "sincerely hungry for the company of his child and for a chance to bond in a normal fashion with him" and who also would "foster a loving relationship between [T. C. F.] and the Mother." The court stopped short of declaring that Smith had fabricated the rape and molestation allegations, but found her "two year crusade" about the

_____

[2] The evaluator noted that Smith's delay in reporting the alleged "pee pee" incident was suspicious because "[a] fit mother has to report that kind of information."

8

alleged molestation to be "disturbing." The court further found that Smith had essentially used Pearce when it was convenient for her, then pushed him away with a "lack of appreciation for the seriousness of this matter and the amount of pain she had caused [him]." Finally, the court worried that if Smith remained the primary custodial parent, Pearce "will never be allowed to bond with and parent the child with all he has to give and the child will suffer tremendously from such a loss." Later, the court entered a separate order awarding Pearce $68,500 in attorney fees, plus expenses,[3] under OCGA § 9-15-14. The court ruled that Smith had engaged in various actions for delay and harassment and had unnecessarily prolonged and expanded the litigation.

Smith filed a motion to set aside the legitimation and custody order, arguing that although legitimizing T. C. F. as Pearce's child was "the right thing to do," the evidence did not support the court's custody ruling. She also filed a motion for new trial, arguing that the court failed to consider the "best interest" factors under OCGA § 9-9-3 (a) (3) in issuing its custody award. The superior court denied both motions,

---

[3] These expenses included reimbursement for the visitation supervision, special process servers and private investigators, and psychological and psychosexual evaluations.

9

and in Case No. A15A1541, Smith appeals the court's legitimation, custody, and fee order, as well as its prior orders denying her motions to dismiss.

When Smith failed to pay the ordered attorney fees, Pearce filed a petition to cite her for contempt. Following a hearing, the superior court granted the petition, directing Smith to make payments at specified intervals or face incarceration. In Case No. A16A0061, Smith appeals the contempt order.[4]

*Case No. A15A1541.*

1. Smith argues that the superior court erred by denying her motion to dismiss for lack of subject matter jurisdiction. She maintains that legitimating T. C. F. first requires terminating Fahey's parental rights – something only a juvenile court can do. We disagree.

While superior courts have subject matter jurisdiction over legitimation petitions, see *Allifi v. Raider*, 323 Ga. App. 510, 511 (1) (746 SE2d 763) (2013), juvenile courts have exclusive jurisdiction over termination of parental rights, except in adoption cases. See OCGA § 15-11-10 (3) (D). In *Brine v. Shipp*, 291 Ga. 376 (729 SE2d 393) (2012), our Supreme Court noted that "the biological father's petition to

---

[4] Smith filed an application for discretionary appeal, which we granted. See Case No. A150453, decided July 7, 2015.

10

legitimate a child who was born in wedlock is in essence a petition to terminate the parental rights of the legal father." Id. at 379 (3). Accordingly, the court held that "[w]hen a biological father's petition to legitimate a child born in wedlock can only be granted by first terminating the legal father's parental rights, . . . the superior court does not have jurisdiction over the termination decision." Id. at 380 (3). Smith argues that *Brine* controls and requires reversal of the superior court's legitimation and custody ruling.

But as Pearce points out, T. C. F. had no legal father when this legitimation and custody action was filed. A "legal father" is a man who

> [w]as married to the biological mother of [a] child at the time the child was conceived or was born, unless such paternity was disproved by a final order pursuant to Article 3 of Chapter 7 of this title;[5] . . . *and who has not surrendered* or had terminated his rights to his child.

(Emphasis supplied.) OCGA § 19-7-21.1 (a) (2) (B); see also *Baker v. Lankford*, 306 Ga. App. 327, 329 (1) (702 SE2d 666) (2010). In the judgment finalizing Smith and Fahey's divorce, which was entered eight months before Pearce filed this lawsuit, the Florida court ordered that, by stipulation of the parties, Fahey had "no parental rights

---

[5] OCGA §§ 19-7-40 et seq. concern proceedings for the determination of paternity.

11

or responsibilities" regarding T. C. F. In light of this stipulation to the surrender of his parental rights, Fahey was no longer T. C. F.'s legal father, and he therefore had no parental rights for the superior court to terminate in this action.[6] Accordingly, *Brine* does not apply here, and the superior court did not exceed its subject matter jurisdiction by legitimating T. C. F.[7]

2. Smith contends that the superior court should have granted her motion to dismiss for insufficient service of process. First, she asserts that service by publication was not authorized because there was no competent evidence that she had evaded personal service. The record, however, is replete with evidence of evasion and concealment: Smith left town abruptly without telling Pearce where she and T. C. F. were going and ignored his repeated emails and text messages asking where she and the boy were, and neither the sheriff's department nor any of the multiple

---

[6] Indeed, the superior court did not purport to terminate Fahey's parental rights. Compare *Brine*, supra (reversing superior court order that not only granted biological father's legitimation petition, but also explicitly terminated legal father's parental rights); *Chandler v. Rohner*, 323 Ga. App. 713 (747 SE2d 870) (2013) (superior court could not take "additional step of terminating [biological father's] parental rights" in order denying his legitimation petition).

[7] And because a legitimation petition may include custody claims, OCGA § 19-7-22 (f.1), the superior court also had subject matter jurisdiction to award custody of T. C. F. to Pearce.

investigators that Pearce hired were able to locate them. In light of this evidence, the superior court was authorized to allow service by publication. See *Hutcheson v. Elizabeth Brennan Antiques & Interiors*, 317 Ga. App. 123, 126-127 (1) (730 SE2d 514) (2012) (trial court did not err in ordering service by publication based on evidence that defendant was evading personal service).

Smith also contends that, assuming service by publication was permissible, Pearce failed to effect it properly. "Service must be properly published as set forth in OCGA § 9-11-4 (f) (1) (C)." *Ragan v. Mallow*, 319 Ga. App. 443, 446 (2) (744 SE2d 337) (2012). That statute provides in relevant part:

> When the court orders service by publication, the clerk shall cause the publication to be made in the paper in which sheriff's advertisements are printed, four times within the ensuing 60 days, publications to be at least seven days apart. The party obtaining the order shall, at the time of filing, deposit the cost of publication. The published notice shall contain the name of the parties plaintiff and defendant, with a caption setting forth the court, the character of the action, the date the action was filed, the date of the order for service by publication, and a notice directed and addressed to the party to be thus served, commanding him or her to file with the clerk and serve upon the plaintiff's attorney an answer within 60 days of the date of the order for service by publication and shall bear teste in the name of the judge and shall be signed by the clerk of the court.

13

OCGA § 9-11-4 (f) (1) (C). Smith maintains that Pearce failed to follow this statute exactly because, according to his lawyer's certificate of compliance, the lawyer – rather than the clerk of the superior court – mailed the publication notice to the Fulton County Daily Report.

Smith relies upon *Jahanbin v. Rafieishad*, 292 Ga. 806 (741 SE2d 648) (2013), in which the Supreme Court ruled that a plaintiff failed to comply with the statutory requirements for serving a person in a foreign country because the plaintiff, instead of the clerk of court, completed the registered mail receipt and accomplished the mailing to the defendant in Iran. See OCGA § 9-11-4 (f) (3) (B) (iii) (II) (providing for service upon a person in a foreign country by "[a]ny form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served"). The court held that

> the plain language of this provision requires the clerk of court to be the person who addresses and dispatches the mail containing the summons, thus ensuring that an officer of the court disinterested in the proceedings is able to verify both the contents of the mailing and the address to which it is sent.

14

*Jahanbin*, 292 Ga. at 807 (1). Smith argues that *Jahanbin* prohibits an attorney from doing the clerk's job of mailing out a publication notice. We disagree with this analysis.

Unlike the statutory provision for service upon a person in a foreign country, the provision for service by publication provides only that the clerk must "cause the publication to be made"; it neither specifies the manner in which the clerk must cause the publication to be made nor requires the clerk to accomplish the task personally. See OCGA § 9-11-4 (f) (1) (C). In any event, the rationale for *Jahanbin*'s holding – the need for a disinterested party to verify a registered mailing to a foreign country – is not present here, where publication in a readily-accessible domestic newspaper may be easily substantiated. Smith's challenges to the sufficiency of service are without merit.

3. Smith maintains that the superior court erred by denying her motion to set aside the judgment "[f]or all of the reasons provided" in the motion. In the motion, Smith argued that the factual findings in the court's legitimation and custody order were "based on fiction" and "fail[ed] to portray the actual evidence in this case." This was a bitter, protracted custody battle in which the parties presented sharply divergent accounts of the events. "We are mindful that the Solomonic task of making custody

decisions lies squarely upon the shoulders of the judge who can see and hear the parties and their witnesses, observe their demeanor and attitudes, and assess their credibility." (Citation and punctuation omitted.) *Bankston v. Warbington*, 332 Ga. App. 29, 30 (771 SE2d 726) (2015). We will not disturb the superior court's exercise of discretion if there is any evidence to support its decision. *Arthur v. Arthur*, 293 Ga. 63, 64 (1) (743 SE2d 420) (2013); *King v. King*, 284 Ga. 364, 365 (667 SE2d 30) (2008). Our review of the record, summarized above, shows that the court's ruling in this case was supported by evidence in the record. Thus, the court did not err by denying Smith's motion to set aside.

4. Smith argues that the superior court erred by failing to consider all factors relevant to custody decisions under OCGA § 19-9-3 (a) (3). That statute provides that "[i]n determining the best interests of the child, the judge may consider any relevant factor, including but not limited to" a list of 17 such factors. By the plain language of the statute, the list is suggestive only, and the superior court need not mechanically analyze every enumerated factor, regardless of its relevance. See *Bankston*, supra at 33 (1). The legitimation and custody order shows that the court considered a broad range of factors, including Pearce's love for T. C. F., financial and residential stability, and commitment to his family; the strong bond between Pearce and T. C. F.;

16

and Smith's relational and residential instability, relentless and unproven allegations of rape and molestation, and withholding of T. C. F. from Pearce. Accordingly, this enumeration of error is without merit.

5. Finally, Smith contends that Pearce was not entitled to attorney fees under OCGA § 9-15-14, and that even if he was, the amount awarded was not related to any sanctionable conduct. Although we find no abuse of discretion in the superior court's determination that a fee award was justified, we agree that the award must be properly apportioned.

(a) Under OCGA § 9-15-14 (b), the trial court may award

reasonable and necessary attorney fees upon a finding that an action or any part thereof lacked substantial justification, was interposed for delay or harassment, or an attorney or party unnecessarily expanded the proceeding by other improper conduct. The damages authorized by § 9-15-14 are intended not merely to punish or deter litigation abuses but also to recompense litigants who are forced to expend their resources in contending with abusive litigation. An award of fees under OCGA § 9-15-14 (b) is discretionary and the standard of review is abuse of discretion.

(Citations and punctuation omitted.) *Abt v. Abt*, 289 Ga. 166, 167 (709 SE2d 806) (2011).

17

The superior court found that Smith unnecessarily prolonged the proceedings, expanded the litigation, harassed Pearce, and increased his litigation costs by (1) insisting that Pearce submit to a paternity test even though he had already done so and she had stipulated in her divorce action that he was the father; (2) playing "games" to evade service and filing multiple unsuccessful motions to dismiss based upon lack of service; (3) hiding T. C. F. from Pearce for 18 months and then insisting upon supervised visitation; (4) seeking a psychological evaluation of Pearce two weeks before the original trial date; and (5) making dubious allegations that Pearce had sexually molested T. C. F. and refusing to back down even after psychological and psychosexual evaluations, as well as multiple official investigations, cleared him of suspicion. Our review of the record, as summarized above, shows that there was ample evidence to support these findings. Accordingly, the superior court did not abuse its discretion by awarding fees to Pearce under OCGA § 9-15-14 (b). See *Abt*, 289 Ga. at 167; *Taylor v. Taylor*, 282 Ga. 113, 115 (3) (646 SE2d 238) (2007) (evidence of husband's conduct during litigation justified fee award for unnecessarily expanding litigation and harassing wife); *Wrightson v. Wrightson*, 266 Ga. 493, 496-497 (467 SE2d 578) (1996) (similar).

(b) An award of attorney fees under OCGA § 9-15-14, however, must be limited "to those fees incurred because of the sanctionable conduct." *Brewer v. Paulk*, 296 Ga. App. 26, 31 (2) (673 SE2d 545) (2009). Pearce sought $86,050.17 in attorney fees, and his motion attached itemized billing statements from his lawyers. Ultimately, the superior court awarded him $68,500 in attorney fees, but it did not indicate how it apportioned this award to fees that were generated in relation to Smith's sanctionable conduct. See *Fedina v. Larichev*, 322 Ga. App. 76, 81 (5) (744 SE2d 72) (2013). Moreover, counsel's bills included time spent on Smith's appeal to this Court in Case No. A14A0298, but "[a]ttorney fees incurred in connection with appellate proceedings are not recoverable under OCGA § 9-15-14." *Kautter v. Kautter*, 286 Ga. 16, 19 (4) (c) (685 SE2d 266) (2009).

> The trial court's award of $[68,500] may have been reasonable, but the trial court's order, on its face[,] fails to show the complex decision making process necessarily involved in reaching a particular dollar figure and fails to articulate why the amount awarded was $[68,500] as opposed to any other amount. Accordingly, we must vacate the award and remand for appropriate factfinding with respect to the amount of attorney fees to be assessed.

19

(Citation and punctuation omitted.) *Fedina*, 322 Ga. App. at 81 (5).[8]

*Case No. A16A0061.*

6. Smith appeals the superior court's order finding her in contempt for failing to pay the ordered attorney fees and expenses. Because we vacate the attorney fee award for the reasons discussed in Division 5 (b), we also vacate the related contempt order.

*Judgment in Case No. A15A1541 affirmed in part and vacated in part, and case remanded with direction. Judgment in Case No. A16A0061 vacated. Ray and McMillian, J.J., concur.*

---

[8] We reject Smith's argument that the superior court improperly awarded fees to Pearce's attorney, rather than to Pearce. Although the order specified that the fees were "payable by the Mother to the Father's attorney," the award plainly was made "to the Father." "It follows that there was no error." *In re Singleton*, 323 Ga. App. 396, 407 (7) (744 SE2d 912) (2013).