**FOURTH DIVISION**
**DILLARD, P. J.,**
**BROWN and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 24, 2024**

# In the Court of Appeals of Georgia

A24A0159.  SCRUDDER,  BASS,  QUILLIAN,  HORLOCK, LAZARUS & ADELE, LLP v. BARKEN et al.

DILLARD, Presiding Judge.

In this discretionary appeal, Scrudder, Bass, Quillian, Horlock, Lazarus & Adele, LLP ("the Firm") challenges the trial court's order granting attorney fees and litigation expenses under OCGA § 9-15-14 (b) to Rhonda Barken, the sole heir and administratrix of the Estate of Daniel James Barken. The Firm argues the trial court erred by (1) applying a negligence standard to *sua sponte* impose sanctions under OCGA § 9-15-14 (b); (2) punishing the Firm when there is a lack of evidence to

support sanctions; and (3) imposing an excessive penalty not tailored to the sanctioned conduct.[1] For the following reasons, we reverse.

In January 2012, Barken's husband was struck and killed by another vehicle while driving his motorcycle in a reversible lane in Atlanta. Barken proceeded to file suit against the City of Atlanta and two public works employees: Ann Green, a traffic systems operator during the time in question, and Kevin Billups, a traffic supervisor.[2] Barken asserted the defendants failed to inspect and maintain a traffic signal governing the flow of traffic in the reversible lane, thus causing or contributing to the accident that killed her husband. The City's law department and an outside law firm jointly represented all three defendants.

During the ensuing discovery process, Barken obtained three service requests regarding malfunctioning lane lights at the relevant location. Green ostensibly created

---

[1] Oral argument was held in this case on January 9, 2024, and is archived on the Court's website. *See* Court of Appeals of Georgia, Oral Argument, Case No. A24A0159 (Jan. 9, 2024), *available at* http://vimeo.com/901673974.

[2] Barken initially sued the at-fault driver, the City, and four placeholder defendants. After the at-fault driver was discharged in bankruptcy, Barken dismissed the suit and filed a renewal action against the City, 21 City employees, and five John Doe defendants. Following the trial court's order on the parties' joint motion to dismiss, only the City, Green, and Billups remained.

the service requests on September 14, September 15, and December 2, 2011—only months before the fatal collision. As a result, Green was later asked about these specific service requests—and service requests in general—in a 2017 deposition.[3]

According to Green, a service request is an inspection notation or an initiation of service when a constituent calls the City with a concern, at which point a technician goes out to inspect the problem. If work is required (*e.g.*, a signal bulb needs to be changed), a work order is then created; and when the work is complete, both the work order and service request are closed.

As part of her job duties at the time, Green created service requests using specific computer software and then contacted the technician assigned to the relevant City quadrant to notify them of the problem (so they could inspect the issue). Green would also note in the system when the technician was contacted and then, separately, when they arrived on the scene. If the technician reported that the reported issue required work to fix it, Green would then create a work order. And Green testified that when a signal was out on a reversible lane, this was considered an emergency situation

---

[3] Green did not do anything to prepare for her 2017 deposition, including any review of documents. She also had no involvement in collecting documents produced for the case.

and was required to be coded that way. She was then shown the service requests relevant to this case.

The first service request—from September 14th—reflected Green's name and the unique identification number she used within the service-request software system. She responded to questions about this request as follows:

Q: Does this tell you that you input information into this service request?

A: It tells me that my name was utilized to create that request, yes.

Q: And I know this was six years ago and I assume you don't have any specific independent recollection sitting down to the computer on . . . September 14th and inputting any of this information here; is that correct?

A: That is correct.

Q: So unless somebody else logged in with your [identification] number, you assume this is information that you put into this form?

A: Yes, sir.

Q: The request type is TC902. Do you know what that stands for?

A: TC902 represents a non-emergency request.

Q: And then it says, just below that non-emergency, [']signal repair[']; correct?

A: That is correct.

Q: Why would TC902 non-emergency signal repair be typed in at that spot?

A: I have no idea.

Q: Is that something you would have made a determination about if you were creating this form?

A: Absolutely not.

Q: Why not? Why do you say that?

A: Because this — according to the location here, it's a lane light request.

Q: So tell me why those two things don't match up if that's what you're saying?

A: Because according to our work practices, lane lights, especially with a bulb X or a checkmark or the LEDS that are at the location could be impeding traffic and it requires immediate attention.

Green also agreed the September 14th service request indicated in the comments that the red X lane light was out, accompanied by her initials, as follows:

Q: Do you know why [the request] says AMG?

A: It has my initials.

Q: So is that how you typically would end a comment like that?

A: That's my trademark, yes.

Q: Looking at that and seeing AMG, are you at least reasonably certain that those comments were typed by you?

A: I cannot say, sir.

Q: You don't know. It was either somebody using your [identification number] and signing off with your initials or it was you? Those are the two options; right?

A: That is correct.

Green was then asked about the September 15th service request, which she thought might be a duplicate of the previous day's request. She testified about that request as follows:

> A: I wouldn't have repeated this work twice. I would have done it once and created a work order to task the first order, [the September 14th] service request, not the second one.
>
> To me this second service request is redundant. You know, it's duplication, so the same issue hasn't been resolved. So it wouldn't have been created. I wouldn't have created a second service request for the same location with the same issue.
>
> Q: But that did happen; right?
>
> A: According to here, yes.
>
> Q: And can you tell us why that happened?
>
> A: No, sir.

Despite Green's testimony about the standard procedures for service requests and the creation of work orders, there was no indication of any work order ever being created for either of the September service requests. There also was no work order

created for the December 2nd service request, though it was also coded as a non-emergency. Green further testified that it was impossible to determine from the service requests when the information was entered into the service-request software system (whether on the date of the request or at a later time)—though she later equivocated and said she would have to ask the IT department.

Following Green's deposition, Barken requested two years' worth of time sheets for approximately 16 City employees in the traffic division. And on January 3, 2018, the City produced roughly 4,500 pages of records, including Green's attendance records, which showed that she was not at work on September 15 or December 2, 2011—two of the three service request dates. On January 29, 2018, about three weeks after the attendance records were produced, the outside law firm that had been representing the defendants was substituted with Scrudder, Bass, Quillian, Horlock, Lazarus & Adele, LLP.

More than four years after the Firm took over representation of the defendants, the case was called to trial on March 1, 2022. But just before opening statements were to begin on March 2, the Firm informed the trial court it had just become aware of a

conflict that precluded it from continuing to represent all three defendants.[4] And out of concern for client confidentiality, the Firm did not give many particulars about the nature of the conflict. But when asked to estimate "a point in time" when the conflict arose, the Firm responded that "the conflict, itself, although we were unaware of it, would have arisen multiple years ago." But the Firm did *not* believe the conflict predated the filing of the renewal action in 2016, and it said the information provided to it that morning was "brand new." So, immediately after learning of the conflict, the Firm investigated its legal and ethical obligations.

The Firm then requested a continuance (so each client could acquire appropriate representation), explaining that it had done its "due diligence and only became aware of this conflict, which is very, very different, just today," and was unaware of "what could have been done previously to have found out this information beyond what we have done already" because the information it received that morning was entirely new. Nevertheless, the trial court noted that—in the absence of any information about the nature of the conflict—it was unable to determine whether

---

[4] The attorney appearing on behalf of the City of Atlanta Law Department also indicated that he now had the same conflict, though he was unsure whether the conflict applied to the entire Department.

9

withdrawal was required under the Georgia Rules of Professional Conduct. The court then continued the case for five days and advised it would "entertain a substitution of counsel in the interim period," though it did *not* intend to further continue the trial.

Two days later, the Firm filed an emergency motion to withdraw, asserting—without any additional details—that, on the morning of March 2, 2022, it "learned of new information from [its] clients" giving rise to a conflict which precluded its continued representation. And when the trial resumed, the trial court held a hearing on the emergency motion, during which the Firm said only preliminary steps were taken to secure new counsel for the defendants. The Firm again refused to disclose the basis for the conflict of interest on the grounds of client confidentiality and requested to be heard by the court in camera to provide additional information. But the court refused this request, claiming that it would "create[] the possibility that the [c]ourt might need to be disqualified from a case that has been on my docket since 2016, and that is not going to happen."

The trial court declared a mistrial, but decided—on its own motion—to "proceed with hearing the issue of repayment of plaintiff's expenses for preparing for trial against counsel" under OCGA § 9-15-14 (b). The trial court then opened

discovery so Barken could investigate the conflict of interest and file any brief or affidavits related to the court's motion.

During this discovery process, Barken learned that—during jury selection—Green reviewed her 2017 deposition and decided to log in to her employee portal to view her attendance records for the dates in question because she was concerned about the information contained in the relevant service requests.[5] In doing so, Green realized that she was not at work on two of the three dates at issue and brought this information to the Firm's attention. In doing so, Green relayed her belief

---

[5] The portal provided the same information contained in the attendance records that the City turned over in January 2018, but Green testified it did not occur to her to check her attendance records—or even that it was possible to check as far back as 2011—until March 2, 2022. She further testified that she could not have checked her attendance records prior to her deposition in 2017 because public-works management at that time would not permit it. When Green was asked whether it would have been possible for her to access the information that led her to become suspicious of the relevant service requests prior to March 2, 2022, she indicated it would not have been possible because she believes "some paperwork is being hidden." Along these lines, Green also indicated that when she became concerned about the service requests in 2022, she went for the first time to look for dispatch log sheets that she would have maintained in her position during the time in question, but the logs for September 2011 through January 2012 were no longer stored in the control center with all other dispatch logs—which she could not explain. And when she was asked why she had not previously looked for these dispatch logs, Green explained that her focus at the time of her 2017 deposition was on her new employment position in a different City department, and it was her assumption that City Law Department attorneys would have looked for the log sheets.

11

that someone else created the service requests using her identification number and initials "to make it look as if I was at work on the days I was off." Even so, she agreed it was possible to be absent on the days in question and still have entered information into the system when she returned at a later date. But contrary to some of her 2017 testimony, Green said in her 2022 deposition testimony that the service requests reflect "in real time" when they are initiated in the system and the initiation or creation date cannot be altered later, though other dates within a service request *can* be altered.

Green refused to speculate as to why someone would possibly forge documents using her initials, but then suggested that it may have been another employee who did not like her. But she admitted that, prior to March 2, 2022, she had never been concerned about anyone forging documents using her information. Even so, Green explained that anyone in the department has the ability to create a service request using another employee's unique identification number in the software system; but she did not have any idea as to who might have used her identification number on the occasions in question.

The trial court conducted an evidentiary hearing in October 2022, and explained that the case was rescheduled for trial the following February, but that it would still proceed with considering sanctions under OCGA § 9-15-14 (b). And during the hearing, the Firm explained it interpreted Green's 2017 deposition testimony regarding the service requests as her saying that it had been "many, many years; I don't recollect. I've got some questions; this looks a little funny I'm not sure[,]" but she "never at any point . . . said [']I don't believe I did this. I believe somebody else did it.[']" And in support, the Firm played Green's 2022 video deposition, during which she indicated that she had no concern someone was using her identification number to place false information in service requests until March 2, 2022. As a result, the Firm maintained it was not until Green questioned the authenticity of the service requests—the validity of which the City would rely upon in its defense—that an irreconcilable conflict arose. Nevertheless, the trial court decided to sanction the Firm, and then heard testimony from three of Barken's attorneys as to their fees and litigation expenses.

The case went on to settle that same month, after which the trial court issued its ruling on the OCGA § 9-15-14 (b) fees. In its order, the court concluded that

Green's 2017 deposition "shows that it was plainly contemplated by Ms. Green in 2017 that she was uncertain as to the origin of entries that appear to have been created under her name," and her testimony "goes beyond mere uncertainty . . . and clearly raised a significant question as of September . . . 2017, as to whether Ms. Green created the two service requests." The court further noted that the Firm possessed the facts and documents underlying the conflict since its entry into the case in 2018, and so the conflict "plainly could and should have been discovered prior to trial."

In ruling against the Firm, the trial court explicitly noted that the disclosure of the conflict was *not* what it found improper, but was instead the "overall conduct surrounding the disclosure." Specifically, the court took issue with the Firm's failure to timely disclose an apparent conflict to the point of a mistrial because the necessary disclosure occurred after a jury was selected. And the court ultimately concluded that the failure to disclose the conflict prior to trial "constituted a failure to act with a minimum level of diligence," amounting to improper conduct that unnecessarily expanded the proceedings.

The trial court rejected the Firm's argument that opposing counsel needed to prepare for trial regardless of the mistrial, speculating that "it is more likely than not

that all, or substantially all, of the trial preparations done in anticipation of the March 1, 2022 trial, would need to be redone, or at a minimum, carefully reconsidered and evaluated, considering the year-long delay," and given that the defenses "have been substantially altered." The court then awarded Barken $584,082.45, which covered all of the fees and costs associated with trial preparation and the OCGA § 9-15-14 motion. We granted the Firm's application for discretionary review, and this appeal follows.

1. The Firm argues the trial court erred by applying a negligence standard to *sua sponte* impose sanctions under OCGA § 9-15-14 (b). And in a separate enumeration of error, the Firm contends there is insufficient evidence to support the trial court's award. We agree the trial court's findings of fact amount to, at most, potential negligence by the Firm and do not satisfy the standard used to award sanctions under OCGA § 9-15-14 (b)—unnecessarily expanding the proceedings through improper conduct.

As our Supreme Court has explained, if a lawyer has a conflict of interest, he or she "must (at a minimum) disclose it to his client, and in some instances, he must

withdraw from the representation."[6] Indeed, under Georgia's Rules of Professional Conduct, a lawyer *shall not* "continue to represent a client if there is a significant risk that the . . . lawyer's duties to another client . . . will materially and adversely affect the representation of the client," except if the client provides informed consent that is confirmed in writing.[7] But these rules further provide that informed consent is *not* permissible if, *inter alia*, the representation "includes the assertion of a claim by one client against another client represented by the lawyer in the same or substantially related proceeding."[8]

In this case, the Firm maintains that a conflict of interest arose on March 2, 2022, for which informed consent was not permissible; and because continued representation would violate the Rules of Professional Conduct, it immediately sought

---

[6] *Croy v. Whitfield Cnty.*, 301 Ga. 380, 385 (2) (801 SE2d 892) (2017).

[7] Ga. R. of Prof'l Conduct 1.7 (a); *see* Ga. R. of Prof'l Conduct 1.7 (b) ("If client informed consent is permissible a lawyer may represent a client notwithstanding a significant risk of material and adverse effect if each affected client or former client gives informed consent, confirmed in writing, to the representation after: (1) consultation with the lawyer, pursuant to Rule 1.0 (c); (2) having received in writing reasonable and adequate information about the material risks of and reasonable available alternatives to the representation; and (3) having been given the opportunity to consult with independent counsel.").

[8] Ga. R. of Prof'l Conduct 1.7 (c) (2).

to withdraw. Importantly, there is no contention the Firm was *not* required to immediately withdraw from representation or that there was a waivable conflict of interest.[9] So, with the foregoing in mind, we turn now to OCGA § 9-15-14 (b), under which the trial court awarded fees due to the *timing* of the Firm's discovery of the conflict and subsequent withdrawal.

In looking to the text of OCGA § 9-15-14 (b), we necessarily begin our analysis with "familiar and binding canons of construction."[10] And in considering the meaning of this statute, our charge is to "presume that the General Assembly meant what it said and said what it meant."[11] Toward that end, we must afford the statutory text its plain and ordinary meaning,[12] consider the text contextually,[13] read the text "in its

---

[9] It is also undisputed that a written confirmation of informed consent signed by Green earlier in the proceedings was no longer effective once the instant conflict was discovered.

[10] *Holcomb v. Long*, 329 Ga. App. 515, 517 (1) (765 SE2d 687) (2014); *accord In the Interest of L. T.*, 325 Ga. App. 590, 591 (754 SE2d 380) (2014).

[11] *Deal v. Coleman*, 294 Ga. 170, 172 (1) () (751 SE2d 337) (2013) (punctuation omitted); *accord Holcomb*, 329 Ga. App. at 517 (1).

[12] *See Holcomb*, 329 Ga. App. at 517 (1); *accord Deal*, 294 Ga. at 172 (1) (a); *see also Tibbles v. Teachers Retirement Sys. of Ga.*, 297 Ga. 557, 558 (1) (775 SE2d 527) (2015) ("A statute draws it meaning, of course, from its text." (punctuation and citation omitted)); *Chan v. Ellis*, 296 Ga. 838, 839 (770 SE2d 851) (2015) (same); *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) ("A judge is charged with interpreting the law in

17

most natural and reasonable way, as an ordinary speaker of the English language would,"[14] and seek to "avoid a construction that makes some language mere surplusage."[15] In sum, when the language of a statute is "plain and susceptible of only one natural and reasonable construction, courts must construe the statute accordingly."[16]

---

accordance with the original and/or plain meaning of the text at issue (and all that the text fairly implies) . . . ."); *Singletary v. State*, 310 Ga. App. 570, 572 (713 SE2d 698) (2011) ("In construing these statutes, we apply the fundamental rules of statutory construction that require us to construe the statutes according to their terms, [and] to give words their plain and ordinary meaning . . . ." (punctuation omitted)).

[13] *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 10 (133 SCt 2247, 186 LE2d 239) (2013) (Scalia, J) ("Words that can have more than one meaning are given content, however, by their surroundings." (punctuation omitted)); *Deal*, 294 Ga. at 172 (1) (a) ("[W]e must view the statutory text in the context in which it appears[.]"); *accord Hendry v. Hendry*, 292 Ga. 1, 3 (1) (734 SE2d 46) (2012); *Holcomb*, 329 Ga. App. at 517 (1); *see also Tibbles*, 297 Ga. at 558 (1) ("The common and customary usages of the words are important, but so is their context." (punctuation and citation omitted)); *Chan*, 296 Ga. at 839 (1) (same).

[14] *Deal*, 294 Ga. at 172-73 (1) (a); *accord Holcomb*, 329 Ga. App. at 518 (1).

[15] *In the Interest of L.T.*, 325 Ga. App. at 592 (punctuation omitted); *accord Holcomb*, 329 Ga. App. at 518 (1).

[16] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *see also Deal*, 294 Ga. at 173 (1) (a) ("[I]f the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." (punctuation omitted)).

OCGA § 9-15-14 (b) authorizes an award of attorney fees when, among other things, a party "unnecessarily expanded the proceedings through *improper conduct* or acted to cause delay."[17] And an award of damages under this code section is "intended not only to sanction or deter *litigation abuses* but also to recompense litigants who are forced to expend their resources in contending with *abusive litigation*."[18] So, when considering whether to award fees under OCGA § 9-15-14 (b), "the conduct of the party against whom an award is sought, and the conduct of that party's counsel, are considered along with the impact of that conduct on the attorney fees incurred by the opposing party."[19] And we review a trial court's award of fees under Section 9-15-14 only for an abuse of discretion.[20]

---

[17] *Moore v. Hullander*, 345 Ga. App. 568, 572 (2) (c) (814 SE2d 423) (2018) (emphasis supplied).

[18] *Connolly v. Smock*, 338 Ga. App. 754, 757 (1) (791 SE2d 853) (2016) (punctuation omitted) (emphasis supplied); *accord Riddell v. Riddell*, 293 Ga. 249, 250 (744 SE2d 793) (2013); *Moon v. Moon*, 277 Ga. 375, 379 (6) (589 SE2d 76) (2003); *Joe & James Props., LLC v. City of Atlanta*, 368 Ga. App. 302, 308 (3) (890 SE2d 21) (2023), *cert. denied* (Dec. 19, 2023).

[19] *Williams v. Cooper*, 280 Ga. 145, 147 (1) (625 SE2d 754) (2006); *accord Richardson v. Locklyn*, 339 Ga. App. 457, 462 (793 SE2d 640) (2016).

[20] *Moore*, 345 Ga. App. at 572 (2) (c).

Here, in awarding OCGA § 9-15-14 (b) fees against the Firm, the trial court relied solely on *Bircoll v. Rosenthal*[21] for the proposition that the "failure to investigate and a failure to act 'with a minimum amount of diligence' pre-suit" supports an award of attorney fees as "improper conduct." But *Bircoll* is wholly inapposite because the pre-suit failure to investigate in that case led to the plaintiffs filing suit when "they should have known that their claims had no substantial basis."[22] And importantly, the award of OCGA § 9-15-14 (b) fees in *Bircoll* was based on the portion of the statute permitting such an award when "an action, or any part thereof, . . . lacked substantial justification,"[23] *not* on allegations of improper conduct. Even so, the trial court in this case concluded "the [*Bircoll*] principle requiring a minimum amount of diligence [was] applicable" because the Firm's conduct "was improper and unnecessarily expanded the proceedings." Specifically, the court found that the Firm failed "to disclose a conflict that they knew or should have known" prior to the point of needing to declare a mistrial when "the facts and documents that appear to underlie the

---

[21] 267 Ga. App. 431 (600 SE2d 388) (2004).

[22] *Id.* at 439 (2) (c).

[23] *Id.* at 431 (punctuation omitted), *quoting* OCGA § 9-15-14 (b).

20

conflict plainly could and should have been discovered prior to trial." In doing so, the trial court abused its discretion in awarding attorney fees under OCGA § 9-15-14 (b) because the facts are insufficient to support an award for unnecessarily expanding the proceedings by improper conduct.[24]

Once again, an award under OCGA § 9-15-14 (b) is directed at, *inter alia*, addressing *abusive* litigation or,[25] as the statute plainly says, "improper conduct."[26] To that end, we have affirmed awards under OCGA § 9-15-14 (b) for unnecessarily expanding proceedings through improper conduct when (1) a witness disregards

---

[24] For this same reason, we are not persuaded by Barken's argument that our Supreme Court's decision in *Stancil v. Gwinnett County*, 259 Ga. 507 (384 SE2d 666) (1989), supports the trial court's award.

[25] *Riddell*, 293 Ga. at 250; *Moon*, 277 Ga. at 379 (6). *See generally Abusive*, Oxford English Dictionary (2nd ed. 1989) ("1. Wrongly used, perverted, misapplied, *improper*[.]" (emphasis supplied)), *available at* https://www.oed.com/oedv2/00000978 (last accessed May 1, 2024).

[26] *See generally Improper*, Oxford English Dictionary (2nd ed. 1989) ("1. Not truly or strictly belonging to the thing under consideration; not in accordance with truth, fact, reason, or rule; abnormal, irregular; incorrect, inaccurate, erroneous, wrong. . . . 3. Not in accordance with good manners, modesty, or decorum; unbecoming, unseemly; indecorous, indecent."), *available at* https://www.oed.com/oedv2/00113490 (last accessed May 1, 2024).

repeated trial court instructions to avoid mention of a particular topic in testimony;[27]

(2) counsel and a party prolong litigation so as to deprive another party of property in

the interim;[28] (3) a party turns "simple litigation into a complex one" by, *inter alia*,

filing repeated motions to dismiss, sending overwhelming discovery requests,

threatening criminal prosecution, and taking other actions that abuse the litigation

process;[29] and (4) a public official or government entity forces a citizen into court

---

[27] *See Connolly*, 338 Ga. App. at 757 (1) (affirming a trial court's grant of attorney fees under OCGA § 9-15-14 (b) when, "[i]n determining that Appellants' conduct was improper, the trial court found that prior to the subject testimony, it had admonished [appellant's] counsel that it would not allow irrelevant character evidence of the parties' statements or activities, and would not permit the parties to impugn each other's character in front of the jury" (punctuation omitted)); *Corey v. Clear Channel Outdoor, Inc.*, 299 Ga. App. 487, 495 (4) (683 SE2d 27) (2009) (physical precedent only) (affirming award under OCGA § 9-15-14 (b) when trial court concluded a party engaged in improper conduct and unnecessarily expanded proceedings by mentioning a topic the court had repeatedly instructed was not to be mentioned in testimony).

[28] *See In re Estate of Zeigler*, 295 Ga. App. 156, 160 (2) (d) (671 SE2d 218) (2008) (holding trial court did not abuse its discretion in awarding fees under OCGA § 9-15-14 (b) for unnecessarily expanding proceeding by improper conduct when "[t]he probate court found that [executrix] and [her attorney] had conducted themselves in a manner to prolong administration of the estate so as to give [executrix] the opportunity to sell the house, citing among other conduct [executrix's] request for a continuance of the hearing on the petition to remove her as executrix and her sale of the house during the period in which the hearing was continued").

[29] *See Dallow v. Dallow*, 299 Ga. 762, 777–78 (5) (791 SE2d 20) (2016) (holding that award of fees under OCGA § 9-15-14 (b) was supported by findings that appellant filed five

unnecessarily.[30] Conversely, we have explained there is no improper conduct

motions to dismiss appellee's complaint for modification; sent appellee 517 requests to admit; requested appointment of a guardian ad litem six weeks before the trial was scheduled to start; threatened appellee with prosecution for criminal interference with custody and with arrest from her job; and made threats in connection with a settlement proposal that would have required appellee to pay appellant's lawyer $55,000); *see also Smith v. Pearce*, 334 Ga. App. 84, 93 (5) (a) (778 SE2d 248) (2015) (holding trial court did not abuse its discretion by awarding OCGA § 9-15-14 (b) fees when appellant (1) insisted appellee submit to a paternity test despite having already done one and appellant's stipulation appellee was the father; (2) evading service and filing multiple unsuccessful motions to dismiss based on lack of service; (3) hiding the child from appellee for 18 months before insisting on supervised visitation; (4) seeking a psychological evaluation of appellee two weeks before original trial date; and (5) making dubious allegations that appellee sexually molested the child and refusing to back down after appellee was cleared of suspicion); *Bienert v. Dickerson*, 276 Ga. App. 621, 626–27 (4) (b) (624 SE2d 245) (2005) (listing the numerous points of evidentiary support for trial court's award of fees under OCGA § 9-15-14 (b) for engaging in "improper conduct which unnecessarily expanded the proceeding," including failing to turn over key evidence, engaging in ex parte communications with a mediator, filing discovery requests after the close of discovery, filing redundant counts and amendments even after the court ruled on them, and surreptitiously recording conversations with opposing counsel which resulted in extensive correspondence and briefing of the issue).

[30] *See Robinson v. Glass*, 302 Ga. App. 742, 746 (691 SE2d 620) (2010) (holding that an award under OCGA § 9-15-14 (b) was authorized because "[a] public officer that refuses or neglects to obey a plain statutory mandate for almost six months, thereby forcing a citizen to go to the trouble and expense of filing a mandamus petition in order to obtain what he is entitled to by law, and furthermore files an answer denying that the citizen is entitled to relief, should not be able to escape responsibility for his or her inaction by belatedly complying with the law a few days before a scheduled hearing"); *see also McKemie v. City of Griffin*, 272 Ga. 843, 844 (3) (537 SE2d 66) (2000) (holding that an award under OCGA § 9-15-14 (b) might be authorized because the city "continued to pursue the condemnation until after the special master made its award and after the condemnees filed

23

sufficient to support an award under OCGA § 9-15-14 (b) when (1) a *pro se* litigant operates more slowly than an attorney would in litigating a case,[31] and (2) a party maintains a defense from the outset, which results in appellate proceedings by the other party based on the trial court's erroneous ruling as to that defense.[32]

It is clear, then, from both the plain language of OCGA § 9-15-14 (b) and our caselaw that even if the Firm had discovered a conflict existed prior to March 2, 2022, this is not conduct rising to the level of warranting fees under the statute for

---

an appeal as to value and non-value issues" but then "elected to redesign the project and to dismiss its condemnation proceeding," and "[a]lthough dismissal was financially beneficial to the City, it also resulted in a financial detriment to the condemnees, who were required to incur attorney fees to enforce their constitutional right to receive just and adequate compensation for their property").

[31] *See Moore v. Moore-McKinney*, 297 Ga. App. 703, 711-12 (4) (678 SE2d 152) (2009) ("Although [appellant], who was acting pro se, may have been slower than an attorney, this is not a finding which shows that he unnecessarily expanded the proceeding by other improper conduct as contemplated by OCGA § 9-15-14 (b)." (punctuation omitted)).

[32] *See McGahee v. Rogers*, 280 Ga. 750, 754 (2) (632 SE2d 657) (2006) ("[T]here is simply no evidence of any 'improper conduct' on [appellant's] part which unnecessarily expanded the proceeding. He asserted the discharge in bankruptcy defense from the outset. The first appeal was brought by [appellee] because the trial court erroneously held that it had no jurisdiction to determine whether the debts were discharged. Accordingly, [the first appeal] was a necessary expansion of the proceedings attributable to [appellee], and not an unnecessary expansion attributable to [appellant]. Moreover, attorney's fees incurred in connection with appellate proceedings are not recoverable under OCGA § 9-15-14.").

"improper conduct." Our conclusion might very well be different if there were evidence the Firm knew a conflict existed but deliberately waited until the day of trial to withdraw as a means of prolonging litigation, but that is not what the evidence shows *or* what the trial court found occurred.

Additionally, and importantly, the trial court rejected the Firm's request to hear evidence in camera as to *why* the conflict of interest could not have been discovered prior to March 2, 2022. In doing so, the trial court erred in suggesting that it could not hear such evidence without risking disqualification.[33] As a result, because the Firm did not engage in improper conduct as contemplated by OCGA § 9-15-14 (b), the trial court abused its discretion by awarding fees against it on this basis, and we reverse.

---

[33] *See Hill, Kertscher & Wharton, LLP v. Moody*, 308 Ga. 74, 81 (3) (839 SE2d 535) (2020) (explaining that a trial court must "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation, including, if necessary, through in camera review" (citation & punctuation omitted)); *Howard v. State*, 279 Ga. 166, 170 (611 SE2d 3) (2005) (noting that "after an in-camera inspection, the trial court determined that no confidential communications were implicated" through attorney-client privilege).

2. Because we conclude the trial court erred in awarding fees under OCGA § 9-15-14 (b) in Division 1, we need not address the Firm's remaining arguments as to the amount of fees the court awarded.

For all these reasons, we reverse the trial court's judgment as to the Firm.[34]

*Judgment reversed. Brown and Padgett, JJ., concur.*

---

[34] The trial court awarded fees to Barken under OCGA § 9-15-14 (b) against both the Firm *and* the City of Atlanta; but the City is not a party to this appeal, did not file an appellate brief, and did not join the Firm's brief.

We thank the Georgia Municipal Association for its thoughtful amicus brief.